**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

No. 94-60279

UNITED STATES OF AMERICA,

                                        Plaintiff-Appellee,

versus

VICTOR LEAL, ET AL.,

                                        Defendants-Appellants.

Appeal from the United States District Court
for the Southern District of Texas

January 26, 1996

Before King, DeMoss, and Stewart, Circuit Judges.

CARL E. STEWART, Circuit Judge:

## FACTS

The defendants were charged with conspiring, from on or about October, 1991, through January 17, 1992, to possess with intent to distribute over 1,000 kilograms of marijuana (count one) in violation of 21 U.S.C. §§ 846 and 841(a)(1). The underlying events occurred around November 5, 1991. The defendants were arrested in San Antonio on charges of marijuana trafficking.

Becerra's Motion to Suppress

Before trial, defendant Ruben Gil Becerra moved to suppress statements he made to investigating agents in two interviews, one in January of 1992 and the other in June of 1993. He too had been arrested in November 1991 but was released on December 24, 1991, when charges were dismissed. On his way home to the Dallas area, federal agents approached Becerra, allegedly telling him that "any cooperation he'd give would be made known to whatever prosecutor was prosecuting the case." Becerra claims that he was told that he would not see his family for another 20 years if he did not cooperate. Becerra met with federal agents in San Antonio on January 18, 1992. He was not advised of his rights. He spoke of the events of November 5 and "his relationship with the people involved in the [drug] case." The government says that the agents did not threaten Becerra and promised "only that his cooperation would be made known to a prosecutor at the time charges may be leveled against him." They informed him that charges were likely to be refiled later. Becerra says the agents did not record his statement. It was not even typed until April 1992. Agents reviewed Becerra's statement in June 1992. By this time, Becerra was serving in the Mansfield Correctional Institute in Mansfield, Texas, following his arrest on charges stemming from the November drug trafficking arrest.

At a suppression hearing in Laredo on September 29, 1993, the district court denied Becerra's motion.

The Trial

Supporting the government's case were the testimony of several law enforcement agents, a confidential informant ("CI"), tape recorded conversations, and various documents and photographs. The CI worked with a Texas Department of Public Safety officer named De La Garza and an FBI agent named Martinez.

The CI was in contact with the appellants well in advance of November 5 in order to arrange the transaction. According to the government the CI met five times with Aureliano Salinas, Sr., in September and October to discuss plans to transport marijuana to San Antonio. The CI had access to private property along the border between Texas and Mexico through his work in the oil and gas

2

industry.  This was helpful because crossing on private property would be easier than trying to carry drugs past a checkpoint.  In October, the CI met with Aureliano Salinas, Jr., and Jorge Luis Ramirez to show them an entrance to the ranch.  He reported this meeting to De La Garza.  By that time, Salinas, Sr., Salinas, Jr., and Ramirez had decided to move between 1,000 and 1,200 pounds of marijuana from the Laredo area to Mathis, Texas.

On November 2, Salinas, Sr., told the CI he would be ready to transport the marijuana on November 4.  In preparation for a meeting at the home of Salinas, Sr., agents wired the CI with a recording device.  The CI went to the house with a friend named Reymundo Garcia, who did not know the CI was working undercover.  The CI testified that they were to pick up the truck for transporting the marijuana the next morning, November 5.  They then were to pick up the trailer Salinas, Jr., would bring to a roadside park near a ranch and drive it to Mathis.  Although at the meeting they discussed the route over ranch property, the CI hid the fact that he meant to take the truck through the checkpoint.  Alberico Salinas ("Beco") and Ramirez arrived at the house about a half hour into the meeting.  The CI testified that it was then that the final touches were put on the plan. Ramirez was to be in charge of transporting the marijuana after they left Zapata, a small South Texas town.  Beco played a minor role in the discussions, but he was aware of the plan and was to help in shipping the drugs.  Beco and Ramirez were supposed to let the CI know the next morning when the truck would be ready to be picked up.  According to the tape recording concealed by the CI and played in court:

> 1.  Salinas, Sr., said that Ramirez was to be in charge of the marijuana transportation after the former left for Houston.
>
> 2.  Salinas, Sr., said that the marijuana was "wrapped up" and ready to go.
>
> 3.  Beco said that "we went to leave the trailer.
>
> 4.  At some point (Mathis), another driver to be hired by Ramirez was to take over for the CI.
>
> 5.  Salinas, Sr., told the conspirators to return to move other loads if this one proved successful.
>
> 6.  Beco said he would be driving a black BMW during the trip.

3

7. When Ramirez arrived at the meeting, he told the CI that he would get a second driver for the second half of the trip.

8. Ramirez was supposed to ride with the CI in the truck for a portion of the trip.

9. Leal was to be the second driver.

The CI and Garcia picked up the truck the next morning (November 5), as scheduled. It was already loaded. On the way to Mathis, the CI met Beco and Ramirez in a black BMW. Victor Leal was with them. Following Ramirez's instructions, the CI drove the truck to Tynan, a small town near Mathis, and left it in front of a house.

A few weeks later, the CI returned to Salinas's house. Salinas, Jr., and Beco were also there. By this time the authorities had seized the drugs from November 5. Salinas, Jr., told the CI that he had a friend who had two thousand pounds he wanted to move and needed the help of the CI and Garcia.

The CI met with Leal who told him that his attorney had informed him that the November 5 operation had been under steady surveillance. The CI then met with Salinas, Sr., again, who told him to ask Leal "if he would take ten thousand dollars if he would say that he never did see Beco during the first transaction." Salinas, Sr., was to put up the money himself.

The CI met a week later with Salinas, Jr., who introduced him to "Jorge Red." Salinas, Jr., told the CI that this man had been in charge of the first load of marijuana. The CI had no further meetings with any of the defendants. He also was never paid by them for his part in the trafficking. Salinas, Jr., told him that "the people from Mexico" were holding up all payments until they could fully investigate how the authorities learned of the operation.

The agents conducting surveillance corroborated what the CI had to say about the events surrounding the November 5 load and provided additional testimony. De La Garza, the investigator with the Department of Public Safety, said that he noticed Beco, Ramirez, and a man named Ovidio Reyes in the BMW forty miles outside San Antonio. Later he saw the large truck parked near the BMW at a truck stop. He noticed that Leal was driving the truck with the trailer attached.

4

De La Garza followed the truck and the BMW to a motel in the San Antonio area. He noticed Beco, Leal, and Ramirez enter a room there. Leal later left in the truck, heading east on the interstate, followed by a white Chevrolet. Ramirez subsequently drove off in the BMW. De La Garza was among the agents who tracked the large truck and trailer north of San Antonio to a small ranched called the Kirchner Ranch. The agents waited at the ranch entrance. There they stopped the white Chevrolet which contained Beco and Garcia. Three hours later the officers stopped the large truck as it left the ranch. De La Garza noticed Leal and Becerra outside on either side of the truck. When they examined the truck, the officers detected the strong odor of marijuana coming from a porthole on the top of the trailer. They also found a false compartment inside the trailer. Behind the ranch house, in a shed on the ranch property, they found about 3,100 pounds of marijuana.

The agents arrested Beco, Leal, Becerra, and Garcia but dismissed the charges at the request of the United States Attorney's office. The officers seized between $1.8 and $2 million dollars worth of marijuana at the ranch.

Leonardo Perez, a Texas Department of Public Safety officer testified that he went to the Relay Station Motel at 11:00 PM on November 5 and knocked on the door to room 230. He said Salinas, Jr., and a woman occupied the room and consented to a search. Earlier that day Perez was involved in the stop of the white Chevrolet containing Beco and Garcia.

An FBI agent who analyzed the phone records testified regarding calls on November 5 among Salinas, Sr., Leal, the Relay Station Motel, and a phone in Mathis.

Special Agent Rayfield testified about Becerra's statement to agents in January 1992 and June 1993. Becerra's statement had been redacted to exclude the names of the codefendants. Rayfield testified that Becerra admitted to helping unload marijuana. He also told how he led the vehicles from the Relay Station Motel to the ranch in his car.

The government presented evidence of Leal's participation in the shipment of marijuana in South Texas in 1987 over his objection. The district court allowed the evidence after giving a limiting instruction that it was to be considered only as to the issue of "criminal knowledge or intent." Part

5

of that evidence was testimony from William Jenkins, a Laredo Border Patrol agent, that Leal had been stopped at a checkpoint where 300 pounds of marijuana was discovered in large oil drums and a tool box. Leal admitted to the Drug Enforcement Agency that he had received $7,500 for transporting the drugs.

None of the defendants testified at trial.

Discussion

Becerra's Motion to Suppress

Becerra claims that his confession was coerced by threats from federal law enforcement officials. Becerra gave his statement in San Antonio on January 18, 1992, after agents arranged for him to fly from Dallas. There is a dispute as to whether Becerra had been drinking just prior to the interview. Becerra claims that Agent Rayfield testified to smelling alcohol on Becerra's breath, yet proceeded to question him anyway.

The question of voluntariness of a confession is reviewed de novo, and we must give "credence to the credibility choices and findings of fact of the district court unless they are clearly erroneous." United States v. Restrepo, 994 F.2d 173, 183 (5th Cir. 1993). While Becerra makes several claims of coercion, he offers no supporting evidence to upset the finding that he voluntarily cooperated with law enforcement agents.

Motion to Sever

Leal filed a Motion for Severance of Defendants and specifically requested a trial separate from that of Becerra. Leal argues that he and the other defendants were "so intertwined" with Becerra in the government's case as to make it impossible for the jury to consider the case of each separately. He contends that the limiting instruction of the court was inadequate to protect him from the jury associating Becerra's admissions with him.

Rule 8(b) of the Federal Rules of Criminal Procedure allows for the joinder of two or more defendants "if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses." The district court's decision of whether

6

to grant a severance is reviewable only for an abuse of discretion. United States v. Stotts, 792 F.2d 1318, 1321 (5th Cir.1986), cert. denied, 493 U.S. 861 (1989); see also United States v. Salomon, 609 F.2d 1172, 1175 (5th Cir.1980) ("To establish an abuse of discretion of the district court, a defendant must show that he received an unfair trial and suffered compelling prejudice against which the trial court was unable to afford protection."). An appellant must show something more than the fact that a separate trial might offer him a better chance of acquittal. United States v. Polk, 56 F.3d 613 (5th Cir. 1995).

Leal cites Bruton v. United States, 391 U.S. 123 (1968), to argue that a jury instruction to disregard Becerra's admissions when Becerra did not testify in determining his own guilt did not cure the prejudice to him in not being able to cross-examine Becerra. He claims that allowing that evidence to go to the jury offended the Confrontation Clause.

However, in Bruton, the prejudice resided in one codefendant's confession inculpating another. The trial court in that case instructed the jury to disregard those statements in considering the latter's guilt or innocence. Nonetheless, the confession was facially incriminating. In Leal's case, the district court ordered the redaction of all references to the other codefendants from Becerra's admissions. The Supreme Court has held that the admission of a nontestifying defendant's confession is permissible if the trial court gives a proper limiting instruction. Marsh v. Richardson, 481 U.S. 200, 211 (1987). This Court has held that a Bruton problem arises only when the statements clearly implicate the codefendant. United States v. Kelly, 973 F.2d 1145 (5th Cir. 1992). Furthermore, even if a Bruton violation occurs, "the error may be harmless if the statement's impact is insignificant in light of the weight of other evidence against the defendant." Id. Here, Becerra's confession did not refer to Leal by name. There was no direct implication, and the limiting instruction was adequate to prevent prejudice. The district court acted well within its discretion in denying the motion to sever trials.

Rule 404(b)

The district court admitted evidence of Leal's transportation of marijuana in 1987 over his objection. The court instructed the jury to consider the evidence only as to Leal's criminal knowledge and intent with respect to driving the truck.

Leal argues that the evidence prejudiced him and that the use of the 404(b) evidence compromised his right not to testify.

The decision to admit extrinsic offense evidence under Federal Rule of Evidence 404(b) will not be disturbed absent a clear showing of abuse of discretion. United States v. Bruno, 809 F.2d 1097, 1106 (5th Cir.), cert. denied, 481 U.S. 1057, (1987); United States v. Bentley-Smith, 2 F.3d 1368, 1377 (5th Cir. 1993); United States v. Wisenbaker, 14 F.3d 1022, 1028 (5th Cir. 1994). Evidence of prior acts is never admissible to show character and action in conformity therewith. It is, however, admissible if relevant to issues such as intent, plan, knowledge, motive, or absence of mistake. Additionally, the prejudicial effect of the evidence may not outweigh its probative value. Fed. R. Evid. 403; United States v. Beechum, 582 F.2d 898, 910-11 (5th Cir.) (en banc), cert. denied, 440 U.S. 920 (1979).

The district court said that little was known of Leal's role relative to the other conspirators. For that reason, evidence of the 1987 crime was important to help the jury decide the knowledge and intent of Leal in 1991. The circumstances of the two incidents were so similar in nature and proximity that if the jury decided Leal committed the acts he was charged with in 1991, then evidence from the 1987 crime would help establish whether his conduct was innocent or intentional.

The district court did not abuse its discretion in admitting the extrinsic evidence of Leal's 1987 crime.

Sufficiency of the Evidence Regarding Leal and Becerra

Leal and Becerra attack the sufficiency of the evidence supporting their convictions for conspiracy and possession with intent to distribute marijuana. Leal contends that the district court erred in denying his motion for judgment of acquittal made at the close of the evidence. Becerra

claims the district court erred in denying his motion for judgment of acquittal made at the close of the government's case as to both counts.

In reviewing the decision on a motion for judgment of acquittal, this court considers the evidence and the inferences therefrom in the light most favorable to the government and asks whether "a reasonable trier of fact could find that the evidence establishes guilt beyond a reasonable doubt." United States v. Willis, 38 F.3d 170 (5th Cir. 1994). The government establishes a drug conspiracy by proving beyond a reasonable doubt that a conspiracy existed, that the accused knew of the conspiracy, and that the accused voluntarily joined the conspiracy. United States v. Limones, 8 F.3d 1004, 1009 (5th Cir. 1993). To convict for possession with intent to distribute, the government must prove "knowing possession of the contraband with intent to distribute." Id. A jury may infer the elements of a conspiracy conviction from circumstantial evidence: "An agreement to violate narcotics laws may be inferred from concert of action." United States v. Cardenas, 9 F.3d 1139 (5th Cir. 1993). "Knowledge of the conspiracy may be inferred from a collection of circumstances." Id.

Leal denies that the government presented enough evidence from which a jury could infer his participation in a conspiracy to ship marijuana. He says there is no tape recording of him planning any illegal act nor could any of the evidence offered lead a reasonable jury to infer that he knew he was driving a truck loaded with drugs. Becerra's "unsupported statement" that he and Leal unloaded the marijuana stands alone as the "only scintilla of evidence" which could have implicated Leal.

Becerra refers to this court's holding that mere association with someone who controls drugs or the property where the drugs are located is insufficient to support a possession charge. See United States v. Stephenson, 474 F.2d 1353, 1355 (5th Cir. 1973). He says that the most the government proved was that he was at the ranch. There was no evidence he was present when the marijuana was loaded into the truck or that he helped to load it.

Leal's and Becerra's claims are unconvincing. The testimony of the CI and the surveillance agents, viewed in a light most favorable to the jury's verdict, strongly supports the convictions for conspiracy and possession. Leal's presence and activities on November 5 were consistent and

9

coordinate with those of the other defendants whose participation in the conspiracy are more firmly established in the record. The fact that he drove the truck containing the drugs that day and that law enforcement officials documented phone calls between Leal and Salinas, Sr., is heavy support for the jury's findings. Leal's own statements work against his claims in that he told others that "everything had gone sour and [the authorities] had caught the load."

By the same token, Becerra literally confessed to his role in the plan on two occasions. Josue Martinez, one of the surveillance officers, corroborated Becerra's confession when he testified that he saw Becerra and Leal leave the ranch on November 5. Becerra admitted to unloading the marijuana from the truck. The evidence showed Becerra to be a voluntary participant in a plan to transport a considerable amount of marijuana across South Texas and, thereby, supported the jury's determination.

Defendants' Responsibility for over 3,100 Pounds of Marijuana

Ramirez, Salinas, Jr., Salinas, Sr., Beco, and Becerra contend that the district court erred in sentencing them at an elevated offense level, attributing to them over 3,100 pounds of marijuana. They argue that testimony at trial placed the amount at between 700 and 1,500 pounds. Their understanding was that the load would not exceed 1,500 pounds; so the district court should have scored each at Level 28, Category II, of the Sentencing Guidelines.

The government says the district court's finding was not clearly erroneous. The evidence established the truck that carried the marijuana and established that the amount seized weighed over 3,100 pounds and was valued at almost $2,000,000. Also, the government argues that this court may not review the alleged error as it may pertain to Salinas, Jr., and Becerra because these two defendants failed to order the portion of the record containing this alleged error. The government also claims that Becerra neglected to file written objections to the PSR.

The district court's calculation of the amount of drugs involved for purposes of sentencing is reviewed for clear error. United States v. Mergerson, 4 F.3d 337, 345 (5th Cir. 1993). A preponderance of the evidence must support the district court's determination. Id. at 343. The

quantity of drugs involved in the offense determines the base offense level under the Sentencing Guidelines. United States v. Carreon, 11 F.3d 1225, 1230 (5th Cir. 1994). "This quantity includes both drugs with which the defendant was directly involved, and drugs that can be attributed to the defendant in a conspiracy as part of his 'relevant conduct' under § 1B1.3(a)(1)(B) of the Guidelines." Id.

The testimony at trial as to the amount of marijuana to be transported differed from the amount actually seized. None of the testimony indicated over 3,000 pounds of the substance. Rather, the amount ranged from 500 pounds to a little over 1,000 pounds. In particular, the CI said that he was told the defendants agreed to deliver 1,100 pounds of the substance by tanker/trailer. The district court chose to credit the defendants with the actual amount seized from the ranch. The court found it incredulous that the defendants would engage in such a complicated scheme to contribute only a third of the amount to an existing stash. Furthermore, the court surmised that the defendants may have understated the actual amount to the CI for fear he would demand greater compensation given the true value of his services to the operation.

The district court's findings as to the amount of marijuana to attribute are not supported by a preponderance of the evidence. The disparity in the evidence between the defendants activities and the amount of drugs seized is not adequately explained. The reasons the court gave are mere rationalizations, not specific enough to assure us sufficiently that the defendants are reasonably responsible for all the marijuana found at the ranch.[1] Hence, we vacate the sentence and remand to the district court for resentencing, attributing to the defendants the amount of marijuana related in the testimony at trial.

Becerra's Fine

The district court imposed a $1,000 fine on top of Becerra's sentence. He argues that the fine was excessive and constituted a sentence out of proportion with the evidence presented.

---

[1]Admittedly, the trial court's suppositions make sense under the circumstances. Nonetheless, we are constrained from attributing 3,100 pounds of marijuana to the defendants on the basis of intuition alone.

Section 5E1.2(d) of the Sentencing Guidelines sets forth several factors a district court must consider when imposing a fine. See United States v. Young, 66 F.3d 830, 838 (7th Cir. 1995). These factors generally relate to the defendant's ability to pay the fine, the seriousness of the offense, collateral consequences, and any restitution that has been ordered. The defendant has the burden to present evidence with respect to these factors, "particularly the inability to pay." United States v. Matovsky, 935 F.2d 719, 721 (5th Cir. 1991); United States v. Sellers, 42 F.3d 116, 120 (2d Cir. 1994). Still, we may impose a fine even if the defendant is not able to pay. United States v. Altamirano, 11 F.3d 52, 53 (5th Cir. 1993).

There is no indication that Becerra presented any evidence concerning his ability to pay to the district court. Neither is there any evidence that the $1,000 fine was excessive. There was no error.

CONCLUSION

For the foregoing reasons, we REMAND to the district court for resentencing in accordance with this opinion. We AFFIRM the court's judgment as to the remaining claims.