UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 95-50077
_____


United States of America,

Plaintiff-Appellee,

versus

Arturo Pena-Rodriguez, E. Wallace, Lloyd Maestas, Bob Alan
Dickinson, a/k/a "Fred", a/k/a Robert Alan Dickinson, Leonard Gene
Lied, Avelino Gil-Terrazas, Ruben Gallegos, Hector Mendoza-Garcia,
and William Hobert Russell, a/k/a "El Indio", a/k/a William Hobart
Russell,

Defendants-Appellants.

_____

Appeal from the United States District Court for the
Western District of Texas
_____

April 10, 1997

Before BARKSDALE, EMILIO M. GARZA, and BENAVIDES, Circuit Judges.

BENAVIDES, Circuit Judge:

This case involves an appeal by eight appellants from
convictions for various narcotics offenses related to their roles
in an international narcotics-distribution organization. The
superseding grand jury indictment charged thirty-two defendants
with eight counts and resulted in a three-week trial involving
eighteen defendants. At trial, the government called over 100
witnesses and entered more than 800 exhibits into evidence. Each
of the appellants was convicted on the first count of the

indictment, which alleged a conspiracy to possess with the intent to distribute marijuana and cocaine in violation of 21 U.S.C. §§ 841(a)(1) & 846.  In addition, appellants William Hobart Russell and Leonard Gene Lied were convicted of count eight of the indictment, which alleged a conspiracy to launder money in violation of 18 U.S.C. § 1956(a)(1)(A)(I).

The convictions at issue were the result of an investigation by law enforcement agencies that established the existence of a large-scale drug conspiracy.  The leaders of the organization were Eduardo Gonzalez-Quirarte ("Gonzalez") and Avelino Gil-Terrazas ("Gil").  The organization imported marijuana and cocaine into El Paso, Texas, and distributed the narcotics to various states throughout the country, including California, Oklahoma, Indiana, Florida, Colorado, and New Mexico.  The organization transported its contraband in pickup trucks, horse trailers, and semi-tractors that contained hidden compartments.

Appellants contest their convictions on various grounds.  In addition, a number of the appellants challenge the district court's calculation of their sentences under the applicable Sentencing Guidelines.  For the reasons that follow, we AFFIRM the judgment of the district court in all respects.

## I.  Sufficiency of the Evidence

Appellants Leonard Gene Lied, William Hobart Russell, Bob Alan Dickinson, Ruben Gallegos, Maxwell Gene Wallace, and Arturo Pena-Rodriguez argue that there is insufficient evidence to support their convictions for conspiring to possess marijuana or cocaine

2

with the intent to distribute under count one. In addition, Lied and Russell contend that the evidence was insufficient to support their convictions under count eight for conspiring to launder money. In conducting a sufficiency review, we must view the evidence and the inferences therefrom in the light most favorable to the jury's verdict and determine whether "a rational trier of fact could have found these defendants guilty beyond a reasonable doubt." *United States v. Velgar-Vivero*, 8 F.3d 236, 239 (5th Cir. 1993), *cert. denied*, — U.S. —, 114 S. Ct. 1865, 128 L.Ed.2d 486 (1994).

The elements of a drug conspiracy are: "(1) the existence of an agreement between two or more persons to violate narcotics law; (2) the defendant's knowledge of the agreement; and (3) the defendant's voluntary participation in the agreement." *United States v. Gonzalez*, 76 F.3d 1339, 1346 (5th Cir. 1996). Similarly, a conspiracy to launder money under § 1956(a)(1)(A)(I) requires proof that "(1) there is a conspiratorial agreement, (2) one conspirator knowingly commits an overt act by participating in a financial transaction, (3) the financial transaction involves the proceeds of an unlawful activity, (4) the conspirator participating in the transaction had the intent to promote or further that unlawful activity, and (5) the transaction affected interstate or foreign commerce." *United States v. Fierro*, 38 F.3d 761, 768 (5th Cir. 1994), *cert. denied*, — U.S. —, 115 S. Ct. 1431, 131 L.Ed.2d 312 (1995).

This court has recognized that "[a] jury may infer the

3

elements of a conspiracy conviction from circumstantial evidence...." *United States v. Leal*, 74 F.3d 600, 606 (5th Cir. 1996). We have also held that "a guilty verdict may be sustained if supported only by the uncorroborated testimony of a coconspirator, even if the witness is interested due to a plea bargain or promise of leniency, unless the testimony is incredible or insubstantial on its face." *United States v. Bermea*, 30 F.3d 1539, 1552 (5th Cir. 1994), *cert. denied*, — U.S. —, 115 S. Ct. 1825, 131 L.Ed.2d 746 (1995). "Testimony is incredible as a matter of law only if it relates to facts that the witness could not possibly have observed or to events which could not have occurred under the laws of nature." *Id.*

With these principles in mind, we find that the following evidence presented by the government was sufficient to sustain each of the convictions against the appellants.

## A. The Dallas Appellants

The evidence against Lied, Russell, and Dickinson (collectively "the Dallas Appellants") consisted primarily of the testimony of Felipe Madrid, Jr., a co-conspirator, governmental informant, and owner of United Freight Service ("UFS"), the corporation through which the Dallas Appellants conducted their drug-trafficking activities. Madrid testified that in the summer of 1990 he met with Gonzalez, Gil, and Lied to plan what they were going to do with "the proceeds of marijuana." According to Madrid, he served as an interpreter and middle man for the drug organization, wherein Gonzalez was the supplier and Lied was

4

Gonzalez's original distributor in the Dallas area. Madrid testified that this organization began operating in the fall of 1990.

Madrid described the organization's standard procedure for handling a load of marijuana. The process began when Gonzalez arranged for Madrid to pick up marijuana from various locations in El Paso with his van. Madrid then took the marijuana to a "stash house" located on Dale Douglas Street in El Paso where it was weighed and repackaged in small boxes. The small boxes of marijuana were then placed in the van and transported to a warehouse on Rojas Street in El Paso. At the warehouse, Madrid placed the small boxes of marijuana inside larger boxes, filled the larger boxes with Styrofoam, and loaded an 18-wheeler with the larger boxes. Madrid then drove the 18-wheeler to one of two warehouses rented by the organization in the Dallas area.

More specifically, Madrid testified that on one occasion Gil gave him a three- to five-pound sample of marijuana that he took to Lied.[1] Madrid also testified that it was standard procedure for him to give a copy of the recorded weights of shipments of marijuana to Lied. Those weights were used to determine how much the particular load of marijuana was worth. In addition, the weights were relevant because Lied paid Madrid for his work at the rate of $15 per pound of marijuana that he hauled. Madrid testified that he had an ongoing discussion with Lied regarding the

---

[1] Samples are used in the drug trade to demonstrate the general quality of the merchandise, which, in turn, affects the price that the distributor must pay for the goods.

5

delivery of money to Gonzalez for marijuana. On at least a few occasions, Lied gave Madrid drug money that he subsequently delivered to Gonzalez. Moreover, on one occasion in which drug money was transferred, Madrid testified that he, Gonzalez, Gallegos, and Lied were all present. The amounts of these drug payments ranged from $150,000 to $700,000.

Dickinson was the freight manager for UFS. While it is undisputed that Dickinson handled a sizable amount of legitimate cargo hauled by UFS, Madrid testified that Dickinson also participated in the organization's drug-trafficking activities. For example, the organization's stash house on Dale Douglas was rented in Dickinson's name. Moreover, Madrid testified that Dickinson sometimes helped him weigh and repackage the marijuana at the stash house. Finally, Madrid testified that it was "his belief" that on several occasions Dickinson drove trucks that he knew were full of marijuana and picked up drug money. Finally, Madrid testified that Dickinson sometimes helped him count the money that they received for marijuana.[2] In this regard, in the fall of 1991, Dickinson and Madrid complained to each other about the infrequency and insufficient amounts of Lied's most recent payments.

Madrid testified that on one occasion in late December of 1991, he saw Russell at the organization's warehouse in Forney, Texas. Russell was talking to several of the organization's

---

[2] Dickinson was acquitted of money laundering, however, when the jury failed to reach a verdict on that count. *See* FED. R. CRIM. P. 29.

6

Dallas-based employees and was aware that Madrid was unloading marijuana. According to Madrid, Russell's appearance at the warehouse coincided with a change in management in the organization whereby Lied broke off his ties to the organization and Russell took over Lied's role as distributor in the Dallas area. Madrid testified that Russell paid him approximately $20,000 or $30,000 for transporting marijuana on one occasion.

Madrid's active participation in the organization involving the Dallas Appellants concluded in April 1992 when he was arrested and later convicted on an unrelated charge. Madrid testified that the organization owed him approximately $250,000 in "back pay" at the time of his arrest. Madrid told his ex-wife, Gloria Stitt, that any money that he was owed would come from Russell and that she could keep whatever she could procure for their children.

Stitt, a paid governmental informant, enlisted the aid of her brother, Henry Garcia, to procure some of the money owed Madrid by the organization. Garcia wrote Madrid a letter in which Garcia stated that "El Indio wants me to ask what you want done with your cake...." Madrid testified that "El Indio" was Russell's nickname and that "cake" was code for "money" in the organization. Madrid subsequently sent Stitt to pick up the money from Garcia. Garcia gave Stitt a box containing large denominations of cash totaling $60,000. Stitt turned the box and the money over to the government, and at trial she testified consistently with Madrid about these events.

From such evidence, the jury could rationally have concluded

7

beyond a reasonable doubt that each of the Dallas Appellants knowingly and voluntarily participated in a conspiracy to possess with the intent to distribute marijuana. The foregoing evidence was also sufficient to sustain the convictions of Lied and Russell for engaging in a conspiracy to launder money. Specifically, Madrid testified that he received large sums of drug money from Lied and delivered those proceeds to Gonzalez. Furthermore, significant evidence was presented that Russell transferred $60,000 in drug proceeds to Garcia as "backpay" for the work Madrid had done on behalf of the organization. *See United States v. Flores*, 63 F.3d 1342, 1361 (5th Cir. 1995), *cert. denied*, — U.S. —, 117 S. Ct. 87, 136 L.Ed.2d 43 (1996); *United States v. Puig-Infante*, 19 F.3d 929, 937-42 (5th Cir.), *cert. denied*, — U.S. —, 115 S. Ct. 180, 130 L.Ed.2d 115 (1994).

## B. The Oklahoma Appellants

The evidence to sustain convictions presented against Appellants Wallace and Pena-Rodriguez (collectively "the Oklahoma Appellants") came primarily from the testimony of two co-conspirators and governmental informants, Clifford W. Mengers and Randall Bowers. Mengers testified that he was a professional truck driver and small-time drug dealer in Oklahoma. On one occasion, Wallace called Mengers and asked for his help in backing up a horse trailer near Wallace's garage. The horse trailer, which Mengers understood had come from El Paso, had Texas license plates and a hidden compartment that contained marijuana. Mengers testified that he observed Wallace and Jose Gomez remove marijuana from the

8

trailer's hidden compartment.[3]

Mengers also testified that Wallace told him on several occasions that Wallace was expecting to receive cocaine from a man named Arthur. Mengers testified that it was his understanding that "Arthur" was Appellant Pena-Rodriguez because Pena-Rodriguez was the only Arthur that Mengers knew. On one occasion, in fact, Mengers found several kilograms of cocaine in the trunk of Wallace's car, which was being stored in Mengers's garage.

Randall Bowers testified that in 1990, Jose Gomez and he drove a horse trailer containing 350 pounds of marijuana to Wallace's house. Bowers noted that both Wallace and Pena-Rodriguez helped Gomez and him unload the trailer. Bowers also testified that he delivered a load of marijuana to Pena-Rodriguez in early 1991. As compensation for his work, Pena-Rodriguez gave Bowers use of a fancy Chevrolet pickup truck known as "the Boss."

The foregoing evidence was sufficient for a rational jury to conclude beyond a reasonable doubt that Wallace and Pena-Rodriguez knowingly and voluntarily participated in a conspiracy to possess with the intent to distribute marijuana and cocaine.

### C. Ruben Gallegos

Appellant Gallegos was a part owner of the Truck Center of El Paso along with his brother, Art Gallegos, and Eduardo Gonzalez.

---

[3] Evidence that the horse trailer came from El Paso and contained a hidden compartment indicates that this marijuana was part of the larger conspiracy charged in the indictment. Moreover, a variety of evidence in the record ties Jose Gomez, a charged co-conspirator, to other participants in the conspiracy, including Randall Bowers.

9

According to the government's theory of the case, Gallegos's role in the organization consisted primarily of providing vehicles for the shipment of marijuana and cocaine, as well as constructing false fuel tanks that were used to store contraband during its transportation. Gallegos had the distinction of being the only appellant who was the subject of testimony by both of the government's star witnesses, Felipe Madrid, Jr. and Randall Bowers.

Bowers testified that he transported some false fuel tanks that were constructed in California to El Paso and gave them to Gallegos. When Bowers delivered the tanks, Gallegos told him that some of the other tanks used by the organization for smuggling had leaks in them. Gallegos knew this to be the case because he had tested the tanks with water and the tanks leaked. Gallegos expressed concern both that diesel fuel was leaking from the tanks onto the pavement and that fuel was entering into the compartment that stored contraband. Despite this quality control concern, Gallegos accepted the tanks from Bowers.

On another occasion, Bowers picked up a load of cocaine from Avelino Gil's house. Bowers met with Avelino and Norma Gil while waiting for his truck to be loaded. During the ensuing discussion, Gallegos entered the room and announced that "it was ready." Bowers testified that he understood this statement to mean that the altered fuel tanks were ready. Bowers also testified that when Gallegos entered, he was covered with "bondo" dust. Other testimony in the record established that bondo was used to seal the false fuel tanks used by the organization after the tanks were

10

filled with contraband.

Madrid testified that on one or two occasions, when Gonzalez was not available, Gallegos coordinated the pick up of a load of marijuana. Moreover, Gallegos was present when Madrid (on Lied's behalf) transferred $700,000 in drug money to Gonzalez, and Gallegos saw the suitcase that contained the money. Finally, on the day that Madrid was arrested, he had a number of calling cards in his possession. The names and numbers on these cards were in code, presumably to protect the subjects' identities. Madrid testified that one of these cards contained the coded names and phone numbers corresponding to Gallegos, Gil, and Gonzalez.

Again, this evidence was sufficient for a rational jury to conclude beyond a reasonable doubt that Gallegos knowingly and voluntarily participated in a conspiracy to possess with the intent to distribute narcotics.

## II. Multiple Conspiracies

Appellants Lied, Dickinson, Russell, Wallace, and Gallegos argue that a fatal variance existed between the indictment, which alleged a single conspiracy, and the proof at trial, which established the existence of two or more separate and independent conspiracies. Appellants claim that they were prejudiced by the transference of guilt created by voluminous evidence of illegal activity implicating unrelated defendants with whom they were tried. *See Kotteakos v. United States*, 328 U.S. 750, 774, 66 S. Ct. 1239, 90 L.Ed 1557 (1946); *United States v. Sutherland*, 656 F.2d 1181, 1196 (5th Cir. 1981), *cert. denied*, 455 U.S. 949, 102 S.

11

Ct. 1451, 71 L.Ed.2d 663 (1982). In other words, the appellants argue that the prosecution violated "the[ir] right not to be tried en masse for the conglomeration of distinct and separate offenses committed by others." *Kotteakos*, 328 U.S. at 775.

To prevail on this claim, the appellants must prove that (1) a variance existed between the indictment and the proof at trial, and (2) the variance affected their substantial rights. *United States v. Morris*, 46 F.3d 410, 414 (5th Cir.), *cert. denied*, — U.S. —, 115 S. Ct. 2595, 132 L.Ed.2d 842 (1995). "To determine whether a variance existed between the indictment and the proof at trial, the number of conspiracies proved at trial must be counted." *Id.* at 415. Whether the evidence shows one or multiple conspiracies is a question of fact for the jury. *United States v. Guerra-Marez*, 928 F.2d 665, 671 (5th Cir.), *cert. denied*, 502 U.S. 917, 112 S. Ct. 322, 116 L.Ed.2d 461 (1991). "The principal considerations in counting conspiracies are (1) the existence of a common goal, (2) the nature of the scheme, and (3) the overlapping of participants in the various dealings."[4] *Morris*, 46 F.3d at 415. A jury's finding that the government proved a single conspiracy must be affirmed unless the evidence viewed in the light most favorable to the government would preclude reasonable jurors from finding a

---

[4] This circuit has also looked to a different set of factors to count the number of conspiracies proven at trial. These factors include: "(1) the time period involved, (2) the persons acting as co-conspirators, (3) the statutory offenses charged in the indictment, (4) the nature and scope of the criminal activity, and (5) the places where the events alleged as the conspiracy took place." *United States v. Thomas*, 12 F.3d 1350, 1357 (5th Cir.), *cert. denied*, 511 U.S. 1095, 114 S. Ct. 1861, 128 L.Ed.2d 483 (1994).

single conspiracy beyond a reasonable doubt.  *Id.*

Appellants argue that a functional analysis of the proof at trial establishes the existence of at least two separate and independent conspiracies.[5]  These conspiracies were purportedly identified and described by the government's two star witnesses, Bowers and Madrid, neither of whom mentioned the other in his testimony.  According to the appellants, the following factors indicate that Bowers and Madrid described two separate and independent conspiracies: (1) the "Bowers conspiracy" distributed both cocaine and marijuana, whereas the "Madrid conspiracy" distributed only marijuana; (2) the Bowers conspiracy packaged its narcotics at "stash houses" located on Thunder Road and Gage Road in El Paso, whereas the Madrid conspiracy packaged its drugs on Dale Douglas and Rojas Streets in El Paso; (3) the Bowers conspiracy transported its drugs in vehicles with false compartments, whereas the Madrid conspiracy transported its vehicles in unaltered vans and semi-trailers; (4) the Bowers conspiracy distributed its drugs to Indiana, New Mexico, Oklahoma, and California, whereas the Madrid conspiracy distributed its drugs to Dallas; and (5) the Bowers conspiracy operated from May 1987 through 1993, whereas the Madrid conspiracy operated only from the summer of 1991 until April 1992.  In sum, the appellants argue that the two conspiracies packaged different drugs at different places

[5]  *See Morris*, 46 F.3d at 415 & n.2 (noting that this court has moved away from a structural and formal examination of the criminal enterprise toward a more functional and substantive analysis).

13

and distributed them to different locations at different times.

In contrast, the government argues that the proof at trial, viewed in the light most favorable to the verdict, was sufficient for a rational jury to find a single conspiracy beyond a reasonable doubt. The government contends that this court's past application of each of the factors it has deemed relevant to counting conspiracies supports the government's position in this case. First, the government claims that each member of this conspiracy had the common goal of deriving personal gain from the procurement and distribution of controlled substances.[6] Second, the government contends that the nature of this conspiracy was such that its success "depended on the continued willingness of each member to perform his function."[7] Finally, the government contends that "[a] single conspiracy exists where a 'key man' is involved in and

---

[6] *See id.* (noting that this court has defined a common goal so broadly that the requirement may have "become a mere matter of semantics") (quoting *United States v. Richerson*, 833 F.2d 1147, 1153 (5th Cir. 1987)).

[7] *Id.* at 416 (quoting *Richerson*, 833 F.2d at 1154). In concluding that the nature of a criminal scheme evidenced a single conspiracy, the *Morris* court explained:

> If the sellers discontinued selling, there would be no cocaine for [the distributor] and the purchasers to buy. The necessity of a steady cocaine supply to feed a distribution effort is beyond question. Likewise, the distribution effort is critical to the success of the suppliers. If the purchasers ceased to buy, there would be no reason for [the distributor] to buy from the sellers, and hence no reason for the sellers to acquire the cocaine. Thus, although the sellers and the purchasers may not have had a direct relationship with each other, each was necessary for the continued success of the venture.

*Id.* (internal quotations and citations omitted).

14

directs illegal activities, while various combinations of other participants exert individual efforts toward a common goal."[8] According to the government, Gonzalez and Gil, the organization's alleged kingpins, were the "key men" in this conspiracy.

A thorough review of the record establishes that Gonzalez and Gil were, in fact, the leaders of an organization based in El Paso that was supplying marijuana and cocaine to various distributors in California, Oklahoma, Indiana, Florida, Colorado, New Mexico, and Texas. The evidence also establishes that appellant Gallegos helped Gonzalez and Gil in their efforts to supply narcotics to other appellants on several occasions. Other than a common source of supply, however, the evidence does not establish any interdependence between Gonzalez's and Gil's various distributors. Complicating our inquiry, moreover, is the fact that Gonzalez and Gil, the "key men" allegedly tying the conspiracy together, were fugitives from justice who were not present at trial. In any event, we pretermit a finding on the existence of a variance because even if one is assumed, we conclude that the appellants cannot establish that any variance that existed affected their substantial rights.

In *Kotteakos v. United States*, 328 U.S. at 766, the Supreme Court found that a group of defendants had been sufficiently prejudiced by a variance to justify reversal. In reaching its decision, the Court emphasized the size and complexity of the conspiracies involved. More important, however, the Court found

8   *Id.* (quoting *Richerson*, 833 F.2d at 1154).

15

that prejudice inhered in the trial because of "[t]he dangers of transference of guilt from one to another across the line separating conspiracies." *Id.* at 774. The Court concluded that "[i]n the final analysis judgment in each case must be influenced by conviction resulting from examination of the proceedings in their entirety, tempered but not governed in any rigid sense of stare decisis by what has been done in similar situations." *Id.* at 762.

This court has "long held that when the indictment alleges the conspiracy count as a single conspiracy, but the government proves multiple conspiracies and a defendant's involvement in at least one of them, then clearly there is no variance affecting that defendant's substantial rights." *United States v. Faulkner*, 17 F.3d 745, 762 (5th Cir.), *cert. denied*, — U.S. —, 115 S. Ct. 193, 130 L.Ed.2d 125 (1994) (internal quotations and citations omitted). We have also pointed out, however, that we have never held this general rule to be absolute. *Id.* In this regard, we have acknowledged that such an absolute rule would be hard to square with *Kotteakos*. *Id.* at 762 n.20.

In *United States v. Faulkner*, we elaborated on the requisites of establishing a fatal variance in this circuit:

> [The] doctrine regarding variance between an indictment alleging a single conspiracy and proof of separate conspiracies is but one subset of the general concerns of improper joinder and severance. We therefore conclude that where the indictment alleges a single conspiracy and the evidence establishes each defendant's participation in at least one conspiracy[,] a defendant's substantial rights are affected only if the defendant can establish reversible error under general principles of joinder and severance.

16

*Id.* at 762 (footnote omitted). Thus, we look to the law of joinder and severance to determine whether the appellants' substantial rights were affected in this case.

In this regard, Rule 14 of the Federal Rules of Criminal Procedure provides that a court may order a severance "[i]f it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together...." FED. R. CRIM. P. 14. A denial of a motion for severance is reviewed for an abuse of discretion. *Faulkner*, 17 F.3d at 759. To satisfy this standard of review, the defendant "bears the burden of showing specific and compelling prejudice that resulted in an unfair trial and such prejudice must be of a type against which the trial court was unable to afford protection." *Id.* (internal quotations and citations omitted). Any possibility of prejudice, moreover, must be balanced against the public's interest in the efficient administration of justice. *United States v. Hernandez*, 962 F.2d 1152, 1158 (5th Cir. 1992). "The rule, rather than the exception, is that persons indicted together should be tried together, especially in conspiracy cases." *United States v. Pofahl*, 990 F.2d 1456, 1483 (5th Cir.), *cert. denied*, — U.S. —, 114 S. Ct. 266, 126 L.Ed.2d 218 (1993).

A number of factors lead us to conclude that the appellants did not suffer specific and compelling prejudice resulting in a fatal variance. First, the evidence was sufficient to prove each appellant's participation in at least one conspiracy. *See* Part I,

17

*supra; Faulkner*, 17 F.3d at 762. In addition, the district court's multiple conspiracy jury instruction safeguarded the appellants against the possibility of guilt transference.[9] This court has found similar instructions sufficient to cure any possibility of prejudice in other cases. *See, e.g., Faulkner*, 17 F.3d at 759; *Guerra-Marez*, 928 F.2d at 672.

We are also persuaded that evidence exists that the jury was, in fact, able to follow the evidence and reach a fair and impartial verdict against each appellant. *See United States v. Diaz-Munoz*,

---

[9] The district court's instruction provided:

> You are instructed that proof of several separate conspiracies is not proof of a single, overall conspiracy unless one of the several conspiracies which is proved is the conspiracy charged in Count One of the indictment. What you must do is determine whether the single conspiracy charged in Count One existed between two or more defendants. If you find no such conspiracy existed, then you must acquit all of the defendants as to that charge. However, if you are satisfied that the conspiracy alleged in Count One existed, you must determine who were the members of that conspiracy.
>
> You are further instructed that proof of several separate conspiracies is not proof of a single, overall conspiracy unless one of the several conspiracies which is proved is the conspiracy charged in Count Eight of the indictment. What you must do is determine whether the single conspiracy charged in Count Eight existed between two or more defendants. If you find no such conspiracy existed, then you must acquit all of the defendants as to that charge. However, if you are satisfied that the conspiracy alleged in Count Eight existed, you must determine who were the members of that conspiracy.
>
> If you find that a defendant was a member of another conspiracy, but not the one charged in Count One or the one charged in Count Eight of the indictment, then you must acquit that defendant as to that count. In other words, you must find that he or she was a member of the conspiracy charged in the indictment and not some other separate conspiracy.

632 F.2d 1330, 1337 (5th Cir. 1980) (recognizing that the inquiry regarding prejudice involves whether the jury can "keep separate the evidence that is relevant to each defendant and render a fair and impartial verdict as to him?"). Although the jury did not acquit any of the defendants at trial, it was unable to reach a verdict on two counts, which were eventually dismissed pursuant to Rule 29 of the Federal Rules of Criminal Procedure. *Cf. Faulkner*, 17 F.3d at 759. One of the charges on which the jury hung was the money laundering charge against Gallegos under count eight of the indictment. The relevant evidence on this count included Madrid's testimony that he transferred a suitcase containing approximately $700,000 in drug proceeds to Gallegos in the presence of Gonzalez and Lied. Madrid testified that Gallegos saw the suitcase but "not necessarily" the money inside. Given this evidence, the jury's failure to reach a verdict on this count supports an inference that it was able to consider each defendant and each charge separately.

Finally, we note that the verdicts against the appellants in this case did not turn on particularly complex evidence that was likely to confuse the jury. The government implicated the appellants by relying almost exclusively on the direct testimony of co-conspirators and governmental informants. Such testimony was precise in establishing that each of the appellants knew of and participated in a drug conspiracy. While the appellants attempted to discredit the reliability of these witnesses at every stage of the proceedings, their strategy did not work. Instead, the jury chose to believe the government's witnesses and return guilty

19

verdicts. There was no danger that the criminal acts of some would be carried over to the others because the culpability of each was clearly and distinctly proved. In circumstances such as these, when a pure credibility determination was at issue, we are not inclined to disturb a decision that was quite properly and directly within the jury's province.

### III. Fourth Amendment Search

At trial, appellant Lloyd Phillip Maestas moved to suppress evidence attained during a February 27, 1994 search of his ranch in New Mexico because the material facts alleged in the affidavit for the search warrant were based on stale information. The district court found that the information upon which the affidavit was based indicated a long-standing, ongoing pattern of criminal activity. The district court, therefore, concluded that the warrant was supported by probable cause and denied Maestas's suppression motion. On appeal, Maestas contends that the district court's decision constituted reversible error.

This court engages in a two-step review of a district court's denial of a defendant's motion to suppress. *United States v. Satterwhite*, 980 F.2d 317, 320 (5th Cir. 1992). The first step requires the court to determine whether the good-faith exception to the exclusionary rule applies. *See United States v. Leon*, 468 U.S. 897, 922-23, 104 S. Ct. 3405, 82 L.Ed.2d 677 (1984). The second step requires the court "to ensure that the magistrate had a substantial basis for ... concluding that probable cause existed." *Illinois v. Gates*, 462 U.S. 213, 238-39, 103 S. Ct. 2317, 76

L.Ed.2d 527 (1983) (internal quotation omitted).  If the good-faith exception applies, the court need not reach the question of probable cause.  *Satterwhite*, 980 F.2d at 320; *see also United States v. Craig*, 861 F.2d 818, 820 (5th Cir. 1988) ("Principles of judicial restraint and precedent dictate that, in most cases, we should not reach the probable cause issue if a decision on the admissibility of the evidence under the good-faith exception of *Leon* will resolve the matter").[10]

In *Leon*, the Supreme Court established the good-faith exception, holding "that evidence obtained by law enforcement officials acting in objectively reasonable good-faith reliance upon a search warrant is admissible in the prosecution's case-in-chief, even though the affidavit on which the warrant was based was insufficient to establish probable cause."  *Craig*, 861 F.2d at 821 (citing *Leon*, 468 U.S. at 922-23).   "Issuance of a warrant by a magistrate normally suffices to establish good faith on the part of law enforcement officers who conduct a search pursuant to the warrant."  *Id.*  Law enforcement officers cannot establish objective good faith, however, when the warrant is "based on an affidavit 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.'"  *Id.* (quoting *Leon*, 468

---

[10]   We have indicated that "[t]he only instances in which this maxim should not be followed are those in which the resolution of a 'novel question of law ... is necessary to guide future action by law enforcement officers and magistrates.'" *Craig*, 861 F.2d at 820-21 (quoting *Gates*, 462 U.S. at 264 (White, J., concurring)). Moreover, we recognized in *Craig* that "whether the facts alleged in the affidavit were so dated that they failed to establish probable cause at the time the warrant was issued" does not raise a novel question of law.  *Id.* at 821.

U.S. at 923). *See, e.g.*, *United States v. Jackson*, 818 F.2d 345, 350 & n.8 (5th Cir. 1987) (concluding that a "bare bones" affidavit did not justify good-faith reliance on a warrant); *United States v. Barrington*, 806 F.2d 529, 531-33 (5th Cir. 1986) (same).

To prevail on his fourth amendment claim, Maestas must establish that the facts alleged in the affidavit were so dated that no reasonable officer could have believed that the affidavit established probable cause to search his ranch. *Craig*, 861 F.2d at 822. In addressing a similar staleness claim in *United States v. Craig*, we explained:

> Two considerations have consistently appeared in this court's opinions on the issue of staleness. First, if the information of the affidavit clearly shows a long-standing, ongoing pattern of criminal activity, even if fairly long periods of time have lapsed between the information and the issuance of the warrant, the information need not be regarded as stale. Second, the nature of the evidence sought is also relevant. Courts are more tolerant of dated allegations if the evidence sought is of the sort that can reasonably be expected to be kept for long periods of time in the place to be searched.

*Id.* at 822-23 (internal quotations and citations omitted).

The affidavit in the instant case was not so lacking in indicia of probable cause as to render good-faith reliance on a warrant issued pursuant to it entirely unreasonable. The affidavit included information provided by Bowers that set forth the existence of a large-scale and ongoing drug-distribution enterprise. According to Bowers, Maestas's ranch was used by the organization as a distribution point for the shipment of marijuana and cocaine to California, Oklahoma, and Indiana. Bowers claimed that these drugs were transported in the hidden compartments of

22

horse trailers, pickup trucks, and semi-tractors. Approximately six months prior to execution of the contested search warrant, Bowers accompanied federal agents to New Mexico where he pointed out Maestas's ranch and identified several vehicles on the property that Bowers had used to transport drugs.

The affidavit also contained the contemporary observations of government agents that tended to corroborate the information provided by Bowers. Aerial surveillance of Maestas's ranch three days before the contested search produced photographs of several horse trailers and a semi-tractor that were consistent with vehicles described by Bowers. In addition, when Maestas was arrested the day before the contested search, the officers executing Maestas's arrest warrant observed in plain view a number of vehicles fitting Bowers's description. The officers also observed extra saddle fuel tanks (allegedly used by the organization to store contraband) in plain view on the property. Finally, on the day preceding the contested search, a related search of Gil's property produced a horse trailer with a false compartment that was registered to "Maestas Farms."

Maestas argues that the corroborative evidence gathered by the government contemporaneously with its application for a search warrant should be discarded because the evidence is consistent with the innocent activities of a legitimate rancher. This argument is unavailing. Both the Supreme Court and this circuit have recognized that "innocent behavior frequently will provide the basis for a showing of probable cause." *Gates*, 462 U.S. at 243

23

n.13; *see also United States v. Mendez*, 27 F.3d 126, 129 (5th Cir. 1994).  Taken together, the information provided by Bowers and the contemporary, corroborative evidence gathered by the government were sufficient for a reasonable officer to believe that the challenged warrant was based on probable cause.  Thus, the good-faith exception applies, and the district court did not err in denying Maestas's motion to suppress.

## IV.  Conclusion

We have considered the other points of error raised by the appellants and have concluded that they are without merit.  First, Mendoza-Garcia's double jeopardy claim based on *Grady v. Corbin*, 495 U.S. 508, 510, 110 S. Ct. 2084, 109 L.Ed.2d 548 (1990), is rejected because *Grady* was overruled by *United States v. Dixon*, 509 U.S. 688, 703-04, 113 S. Ct. 2849, 125 L.Ed.2d 556 (1993).[11] Second, the appellants' contention that the district court's instructions to the jury impermissibly amended the indictment by broadening the charged offense from a conspiracy to possess with the intent to distribute "marijuana and cocaine" to a conspiracy to possess with the intent to distribute "marijuana or cocaine" is rejected.  We have held that "a disjunctive statute may be pleaded conjunctively and proved disjunctively." *United States v. Johnson*,

---

[11]  To prevail on his double jeopardy claim after *Dixon*, Mendoza-Garcia must establish that his conviction violates the same offense rule announced in *Blockburger v. United States*, 284 U.S. 299, 304, 52 S. Ct. 180, 76 L.Ed. 306 (1932).  Mendoza-Garcia cannot make this showing.  A long line of Supreme Court authority has established "the rule that a substantive crime and a conspiracy to commit that crime are not the 'same offence' for double jeopardy purposes." *United States v. Felix*, 503 U.S. 378, 389, 112 S. Ct. 1377, 118 L.Ed.2d 25 (1992).

24

87 F.3d 133, 136 n.2 (5th Cir. 1996) (quoting *United States v. Pigrum*, 922 F.2d 249, 253 (5th Cir.), *cert. denied*, 500 U.S. 936, 111 S. Ct. 2064, 114 L.Ed.2d 468 (1991) (internal quotations and citations omitted)).  Finally, we have considered the arguments raised by the appellants challenging their Guideline-based sentences and have concluded that they also are without merit.

For the foregoing reasons, the convictions and sentences of the appellants are AFFIRMED.