**Revised October 5, 1998**

**UNITED STATES COURT OF APPEALS
FIFTH CIRCUIT**

_____

No. 96-40569
_____

UNITED STATES OF AMERICA,

> Plaintiff-Appellee-Cross
> Appellant,

versus

RUBEN GIL BECERRA,

> Defendant-Appellant-
> Cross-Appellee,

and

AURELIANO SALINAS, SR; AURELIANO SALINAS, JR;
ALBERICO SALINAS; VICTOR LEAL; JORGE LUIS
RAMIREZ,

> Defendants-Cross-
> Appelees.

Appeals from the United States District Court
for the Southern District of Texas

September 16, 1998

Before WIENER, EMILIO M. GARZA, and BENAVIDES, Circuit Judges.

EMILIO M. GARZA, Circuit Judge:

After a long and somewhat distorted journey, this case now

reaches us on appeal for the second time.  _See United States v._

*Leal*, 74 F.3d 600, 607-08 (5th Cir. 1996). In the first appeal, a prior panel affirmed the convictions of Ruben Gil Becerra ("Becerra"), Aureliano Salinas, Sr. ("Salinas, Sr."), Aureliano Salinas, Jr. ("Salinas, Jr."), Alberico Salinas ("Beco")[1], Victor Leal ("Leal"), and Jorge Luis Ramirez ("Ramirez") for conspiracy to possess with intent to distribute in excess of 1,000 kilograms of marijuana (Count 1) and for possession with intent to distribute the same amount of that drug (Count 2), in violation of 21 U.S.C. §§ 846 and 841(a)(1). The prior panel, however, reversed and vacated the sentences that the district court imposed, concluding that the district court committed clear error in attributing to the defendants the 3,160 pounds of marijuana that police discovered in a shed on the ranch where defendant Becerra unloaded a tanker-trailer full of marijuana.

Our opinion "remand[ed] to the district court for resentencing, attributing to the defendants the amount of marijuana related to the testimony at trial." *Id.* at 607-08. None of the parties disputed that the *testimony at trial* put the weight of the expected marijuana delivery at around 1,100 pounds. *See id.* On remand, however, the government argued that the district court was not bound by our prior opinion to resentence the defendants based on "the testimony at trial" because the prior panel did not have a

---

[1] Throughout the trial and in the prior opinion, the parties referred to Alberico Salinas as "Beco." For the sake of clarity, this opinion will do the same.

transcript of Becerra's sentencing hearing or his confession to the FBI, both of which supported the district court's conclusion that the defendants transported all 3,160 pounds of marijuana discovered in the shed. Nonetheless, the district court determined that it was bound by our prior opinion to resentence each of the defendants based on 1,100 pounds of marijuana, the amount that the confidential government informant ("confidential informant" or "CI") had testified he believed would be delivered.

The government now appeals, alleging that the district court erred in determining that it was bound by our prior opinion to resentence the defendants using 1,100 pounds of marijuana, and that we should apply an exception to the law of the case doctrine to reverse our earlier determination in *Leal*. The government also argues that, in any event, the district court lacked jurisdiction to resentence Leal. Becerra cross-appeals, claiming that the district court erred in resentencing him without granting a four-level, minimal-participant reduction and a three-level, acceptance-of-responsibility reduction. We affirm. Although we agree with the government that the now-supplemented record would have adequately supported the district court's decision to sentence the defendants based on 3,160 pounds of marijuana, the exceptions to the law of the case doctrine do not apply to the case at hand. We similarly reject Becerra's claims of error.

I

While our prior opinion in *Leal* sets out most of the facts of the underlying drug conspiracy, the parties failed to provide the prior panel with significant portions of the district court record. Consequently, the panel did not have before it several important pieces of information relevant to the validity of the district court's sentencing decision. Accordingly, we recite the facts as they relate to the issues currently on appeal and point out the critical facts that the prior panel did not have an opportunity to consider.

The drug conspiracy for which the defendants were convicted culminated on November 5, 1991, with defendants Becerra and Leal driving a tractor-trailer full of marijuana to a ranch north of San Antonio ("Kirchner Ranch"). Because the confidential informant had given the police all the details of the planned delivery, drug enforcement agents had the trailer under constant surveillance throughout this day. After the trailer arrived at the ranch, Becerra unloaded the marijuana into a shed on the Kirchner Ranch. The police arrested Becerra and Leal as they drove the empty trailer from the ranch. The police then entered the ranch and discovered 3,160 pounds of marijuana in the shed. The police subsequently arrested all of the defendants and indicted them for their actions in the drug conspiracy.

Of utmost importance in this case is the fact that Becerra gave two detailed statements to Federal Bureau of Investigation

("FBI") agents in which he admitted that he was told on at least two occasions that the November 5th delivery would total 3,000 pounds. Another significant fact is that Becerra confessed to Judge Kazen in his original sentencing hearing that the shed was empty when he began unloading the trailer and that some of the defendants))after trial, but before sentencing))told him to say that the shed was full of marijuana when he arrived. For reasons we cannot surmise, the government failed to bring either of these facts to the attention of our prior panel. Not surprisingly, Becerra similarly failed to raise them with our prior panel. Because these facts were not considered on the first appeal, we will set them out in detail here.

## A.

In early January 1992, after Becerra and the other defendants had been released from jail at the request of the U.S. Attorney's Office,[2] FBI Agent Mike Rayfield ("Agent Rayfield" or "Rayfield") arranged for Becerra to fly from Dallas to San Antonio to meet at the FBI offices. The FBI paid for Becerra's plane ticket and Agent Rayfield met him at the San Antonio airport on January 18, 1992. Agent Rayfield, together with another FBI Agent, David Schmactenberger, interviewed Becerra for several hours. Although the interview was not tape recorded, Agent Rayfield took detailed notes of Becerra's statement ("January 18th statement"). Becerra

---

[2] The defendants were released so that the government could continue its investigation into related drug conspiracies.

provided a complete description of the November 5th drug conspiracy. Becerra's statement indicates that just prior to the delivery he was told by Michael Goerndt (who is not a defendant in this case) that the delivery would be increased from 800 pounds to 3,000 pounds:

> On Tuesday, November 5, 1992, BECERRA picked up GOERNDT at GOERNDT's house at approximately 11:00 a.m. Between 3:00 and 4:00 p.m., GOERNDT was paged by a guy from Laredo. BECERRA advised that GOERNDT then called Laredo from a pay phone. Upon completion of the call, GOERNDT told BECERRA "were in luck, 800 pounds is on the way." GOERNDT told BECERRA that they were to meet the load at 10:00 p.m.
>   BECERRA advised that GOERNDT was paged again at 7:00 p.m. GOERNDT made a phone call and at the completion of the call told BECERRA they were to meet ERNIE, PABLO, and ROGELIO at a McDonalds and 3,000 pounds of marijuana was on the way. GOERNDT further told BECERRA that 2,000 pounds was for PABLO and 1,000 pounds was for someone else.

Becerra's statement also indicates that during the November 5th delivery, another defendant (Beco) bragged that the 3,000 pound marijuana shipment came from him:

> BECERRA advised that once at the motel ROGELIO stayed in the car (BECERRA's car) and he, BECERRA, went to the room and met with a Hispanic male (later identified by BECERRA in a photo array as ALBERICO SALINAS) who rode with BECERRA and ROGELIO as they led the tanker tractor-tailor to the KIRCHNER ranch. During the drive, ALBERICO constantly bragged about his marijuana trafficking and indicated the 3,000 pounds to be delivered came from him.

Becerra also admitted to Agent Rayfield that he (Becerra) was the one who unloaded the marijuana from the trailer into a shed located next to the main residence. After the interview was finished, Agent Rayfield took Becerra back to the airport and told Becerra to

-6-

"stay in touch."

On June 9, 1993, after Becerra was rearrested and incarcerated in Mansfield Correctional Facility, Agent Rayfield, together with Drug Enforcement Agency Agent Jeffrey Jackson ("Agent Jackson"), met with Becerra to go over his January 18th statement. Agent Rayfield read Becerra his Miranda rights and Becerra signed a statement explaining that he did not have a lawyer and that he did not wish to have one present at that time. Agent Jackson then told Becerra that he would get no more than five years time to serve if he agreed to fully cooperate and testify in this case.[3] Becerra told the agents that he was hoping for probation, but Agent Jackson informed Becerra that probation was not possible. The agents and Becerra reviewed Becerra's statement sentence by sentence, making amendments and changes where Becerra remembered different details. Becerra again acknowledged that the statement was his complete recollection of the events surrounding the November 5th drug bust. Becerra did not state that there was already a substantial amount of marijuana in the shed when he began unloading the trailer (let alone 2,000 pounds), and he did not retract his statements acknowledging that he was told the shipment totaled 3,000 pounds.

Before trial, Becerra sought to have his statements suppressed on the ground that they had been taken in violation of his constitutional rights. The district court held an extensive

---

[3] Becerra never testified at trial and did not receive the benefit of this deal.

suppression hearing in September 1993 at which Agents Rayfield, Schmactenberger, and Jackson, as well as Becerra himself, testified.  At the suppression hearing, Becerra contended that the agents had promised him that he would not be prosecuted if he cooperated with the government and that the agents never read him his Miranda rights at the June 9th meeting.  Becerra did not contend before the district court))and for that matter, still does not contend before this Court))that anything in his statements to the FBI was materially untrue.  At the suppression hearing, Becerra acknowledged that his statements were "very detailed" and that he told the agents "everything that [he] knew" about the drug conspiracy.  Becerra also admitted to Judge Kazen that he signed the waiver of rights form at the June 9th interview, which stated that he did not have an attorney and that he was willing to talk to the agents without one present.  Becerra nonetheless maintained that the agents had forged his signature on a different portion of the waiver form and that he only agreed to speak to the agents because they promised he would not be prosecuted.

Judge Kazen found that Becerra's testimony was not credible and explicitly rejected his assertion that the agents had promised him that he would not be prosecuted.  Judge Kazen accordingly held that Becerra's statements to the FBI were voluntary and would not be suppressed at trial.  As we discuss below, however, the government did not introduce Becerra's statements into evidence at

trial[4] and failed to bring the substance of the statements to the attention of the prior panel in either the first appeal or the petition for panel rehearing.[5]

B

At trial, the government introduced transcripts of recorded phone calls between various members of the conspiracy and the

_____

[4] Because Becerra's statements were not physically introduced into evidence at trial, the district court instructed the jury as follows:

> There is also, and you heard testimony, that one of these defendants, Mr. Becerra, later, after the fact, made certain oral statements tending to admit his guilt, his involvement in this affair. Incidentally, do not expect . . . and you may be confused about this. Do not expect to read that statement because it was not admitted. It was not offered in evidence and properly so. Because, according to the testimony, it is not a signed statement by him, it is not a handwritten statement by him. What you have is the agent telling you what . . . and there, it's the agent's credibility you have to weigh. He is telling you as a witness under oath that Becerra told him these things.
> Now, he claims to have made notes of those, but the notes themselves are not the evidence. It's his recollection of the . . . It's his testimony that's really evidence. Of course, he can be challenged by his notes, and that's why we even had that recess, to be sure that everybody had seen the notes and asked him whatever questions they want to ask him, but I'm just telling you, don't expect to read a statement 'cause there isn't one in evidence. But to the extent that the Agent [Rayfield], I believe, has testified here that [Becerra] told him all of these things, you have to decide what weight to give that.

(ellipses in original).

[5] This omission is particularly puzzling in light of the fact that Becerra's motion to suppress his FBI statements was one of the primary issues before trial and in the first appeal.

confidential informant. The recorded conversations, like Becerra's statements to the FBI, *see supra* at 5, demonstrated that the defendants discussed the delivery of varying amounts of marijuana at different times during the course of the conspiracy. The confidential informant ultimately testified that the defendants told him that the plan was to transport about 1,100 pounds of marijuana from Laredo, Texas to the ranch outside of San Antonio. All parties conceded that following the defendants' arrest, government agents seized 3,160 pounds of marijuana from the shed located on the Kirchner ranch. The defendants produced no evidence that any marijuana was in the shed before Becerra's delivery; indeed, the defendants did not even raise this theory at trial. Similarly, perhaps because the weight of the marijuana was not an element of the substantive offense (and thus was not relevant for the jury),[6] the government produced no witness as to the amount

---

[6] Although the indictment charged the defendants with conspiracy to possess in excess of 1,000 kilograms of marijuana (approximately 2,200 pounds), the weight of the drug is not an element of the substantive offense. *See United States v. Cisneros*, 112 F.3d 1272, 1282 (5th Cir. 1997) ("[T]his Court has held that '[p]roof of the quantity of controlled substances at issue is not an element of an offense under 21 U.S.C. §§ 841(a) and 846.'") (quoting *United States v. Montes*, 976 F.2d 235, 240 (5th Cir. 1992)). The weight of the drug is, however, relevant for sentencing purposes. A ten year mandatory minimum applies where the amount of marijuana is greater than 1,000 kilograms (approximately 2,200 pounds), *see* 21 U.S.C. § 841(b)(1)(A)(vii), while a five year mandatory minimum applies where the amount of marijuana is between 100 and 1,000 kilograms (approximately 220 - 2,200 pounds). *See* 21 U.S.C. § 841(b)(1)(B)(vii).

Thus, the indictment put the defendants on notice that they could be sentenced under the much more stringent penalties for

actually unloaded from the trailer into the shed.

Although none of the parties introduced Becerra's statements into evidence at trial, Agent Rayfield and Agent Jackson testified at length about his two statements. Rayfield testified that Becerra had told him that he unloaded the marijuana from the trailer into the shed and that someone else was supposed to arrive at the ranch to "split up the three thousand pounds of marijuana." Noticeably absent from Rayfield's testimony about Becerra's statement is any suggestion that there was already 2,000 pounds of marijuana in the shed when he began unloading the trailer:

> Prosecutor: Okay. Now, in giving a statement, did the defendant Becerra tell you about the events of November 5th, 1991?
>
> Rayfield: Yes, he did.
>
> Prosecutor: Okay. What did he say about that day?
>
> Rayfield: That basically starting in the morning hours of that day, he was involved with several other people and his function, supposedly, was to help unload a load of marijuana that was coming up, supposedly, from Laredo . . . .

> * * *

---

possessing an excess of 2,200 pounds. Notwithstanding this fact, the defendants put on no evidence supporting their belated claim that 2,000 pounds of marijuana were already in the shed when Becerra arrived with the trailer-full of marijuana.

Prosecutor:     Did he tell you where he
                went then, after being at
                the Relay Station Motel?

Rayfield:       Yes. . . . According to
                Mr. Becerra, about four
                miles south of the ranch,
                he got out of his car and
                got into the truck with
                the driver so that he
                could show him exactly
                where to go on the ranch,
                and that's what he did.
                He led them directly to
                the ranch.

Prosecutor:     Okay. Did he say whether
                or not the tractor
                entered the ranch then?

Rayfield:       Yes. After they drove
                the additional
                approximate four miles
                and drove into the ranch,
                he said they waited about
                thirty minutes. They
                were expecting some other
                people and he was told to
                wait. The other people
                didn't show up and so per
                the instructions he had
                received, they began
                unloading the marijuana
                from the front two
                compartments of the
                tanker truck and then
                loaded it into a shed
                next to a main house on
                this ranch. Part of his
                instructions were to beep
                somebody after the job
                was done, because these
                other people were
                supposed to show up and
                begin splitting up the
                *three thousand pounds of
                marijuana.* . . .

-12-

```
Prosecutor:        Was that the extent of
                   what he told you about
                   his   activities   on
                   November 5th, 1991?

Rayfield:          Yeah, with one exception.
                   While  he  was  at  the
                   ranch,  the  person  who
                   rented the ranch showed
                   up for about a fifteen
                   minute period of time.
```

(emphasis added).

Agent Rayfield also testified about the subsequent June 9, 1993 meeting that he had with Becerra. Rayfield stated that the purpose of the June 9th meeting was "to check the correctness of the statement [he] had originally received from Mr. Becerra." Agent Rayfield testified that he went over the January 18th statement sentence by sentence with Becerra and that except for some minor corrections, "his statement remained the same." Agent Jackson similarly testified that:

> After Becerra was advised of his rights and after Mr. Becerra signed the [waiver of rights form] and myself and Agent Rayfield witnessed it, Mr. Becerra was handed a copy of the original interview from January of '92. We asked Mr. Becerra to read the form in its entirety and he read the form. Once he finished the form, we went line by line, paragraph by paragraph, page by page and reviewed the original statements that were taken in the first interview.

Agent Jackson confirmed that Agent Rayfield's testimony accurately reflected the substance of Becerra's statement, and Rayfield testified that Becerra adopted the written statement as his own.[7]

---

[7]    Notably, at the close of the government's case, Becerra's counsel specifically asked the district court to read Becerra's

-13-

After the jury found the defendants guilty on both counts of the indictment, attention shifted to sentencing. Oscar Chavez, the U.S. Probation Officer ("Officer Chavez"), compiled Pre-Sentence Reports ("PSRs") for each defendant. Based on Becerra's detailed statements to the FBI agents and an interview with Officer Chavez, the PSRs concluded that the defendants transported the entire 3,160 pounds found at the Kirchner ranch. As Becerra's PSR indicated, "[Becerra] made a decision to make a detailed statement to the U.S. Probation Officer during the course of the presentence investigation against the [advice] of his attorney." Becerra's PSR further stated that he "has not denied the factual elements of the offense . . . [and] provided complete information to the Government concerning his own involvement in the offense prior to the trial." The PSR noted that Becerra admitted that he "unload[ed] the marihuana into a storage room adjacent to the ranch house." A fact that was not put in the PSRs))and one that may have avoided the necessity of the remand in this case))is that Becerra also admitted to Officer Chavez that the shed was empty and that it contained only "hay and some dog food" when he began unloading the marijuana

---

January 18th statement:  "If the court would indulge the defendant in reading the statement that Mr. Becerra gave the agents on January of 1992 . . . ."  Counsel further encouraged the court to "take it under advisement and look at the contents of what is alleged on that exhibit, on that alleged statement, it's really Becerra working for [Goerndt], Michael [Goerndt]."

from the trailer.[8]

Based on Becerra's "detailed pre-trial statement to FBI agents" and his "detailed [post-trial] statement to the U.S. Probation Officer," the PSR concluded that "Defendant Ruben Gil Becerra is responsible for participating in transaction number one of this conspiracy involving the seizure of 3,160 pounds of marihuana." Because the drug conspiracy involved more than 2,200 pounds of marijuana (1,000 kilograms), the PSR concluded that there was a ten year mandatory minimum sentence, *see* 21 U.S.C. § 841(b)(1)(A), and that the base offense level under the sentencing guidelines was 32. *See* U.S.S.G. § 3D1.1. Although the Local Rules of the Southern District of Texas generally require written objections to place PSR findings in controversy, *see, e.g., United States v. Ruiz*, 43 F.3d 985, 991 & n.13 (5th Cir. 1995); *United States v. Esqueda-Moreno*, 56 F.3d 578, 581 n.3 (5th Cir. 1995); *cf.* FED. R. CRIM. P. 32(b)(6)(D) ("For good cause shown, the court may allow a new objection to be raised at any time before imposing sentence."), Becerra did not file written objections to the PSR's conclusion that he be sentenced based on 3,160 pounds, nor to the PSR's factual finding that he was responsible for the total amount

---

[8] The fact that Becerra told the probation officer that the shed was empty was revealed at his April 6th sentencing hearing before Judge Kazen. *See infra* at 21-22.

-15-

of 3,160 pounds of marijuana found in the shed.[9]

The PSRs for the remaining defendants similarly concluded that each defendant be sentenced based on the total amount of marijuana transported by the defendants, unloaded by Becerra, and recovered from the shed. Unlike Becerra, each of the remaining defendants filed written objections to the PSR's conclusion that he be sentenced based on 3,160 pounds of marijuana. Significantly, however, none provided rebuttal evidence to contradict Becerra's admissions that he unloaded all 3,160 pounds of marijuana into the shed. Indeed, none of the defendants claimed in their written objections to the PSR that there was already marijuana in the shed when Becerra began unloading the trailer (as discussed below, this theory first was articulated while the defendants were awaiting sentencing, *see infra* at 21-22). In fact, with the possible exception of Salinas, Sr. and Leal, none of the defendants argued that the November 5th delivery involved any amount less than 3,160 pounds of marijuana.[10]

---

[9] If the quantity of marijuana had been 1,100 pounds, the statutory mandatory minimum should have been five years, *see* 21 U.S.C. § 841(b)(1)(B)(vii), and the base offense level should have been 28 under the Sentencing Guidelines. *See* U.S.S.G. § 2D1.1. Becerra's only written objection to the PSR, however, was that it incorrectly determined his criminal history points; this issue is not relevant on appeal.

[10] Salinas, Sr., was the only defendant who contended that there was less than 3,160 pounds of marijuana transported in the trailer. He did not, however, support his contention with any rebuttal evidence, stating in conclusory fashion only that "the amount of marihuana seized is not the amount that was transported

Instead, the defendants grounded their objections to the PSRs on their claims that they did not *intend* to transport 3,160 pounds of marijuana (not that 3,160 pounds was not transported). For example, Ramirez's objection to the PSR simply stated that he "should be sentenced at a base offense level that reflects his *knowledge* and *intent* which is 1,100 pounds." (emphasis added). Salinas, Jr. similarly grounded his objection on "the Probation Officer failing to mention that the negotiations involved 700 to 1,100 pounds of marihuana." Beco's objections stated only that "the evidence presented during the trial talked about transporting 700 to 1,000 pounds of marihuana . . . [and] there is no indicia of reliability that the defendant had *knowledge* that there was a larger amount of marihuana being transported." (emphasis added). As these objections demonstrate, the defendants (at least in their written objections) did not dispute the fact that Becerra unloaded all 3,160 pounds of marijuana found in the shed.

D

The district court held sentencing hearings for Beco, Leal, Ramirez, and Salinas, Sr. on March 28, 1994. The court subsequently held a hearing for Salinas, Jr. on April 1, 1994, and

on November 5, 1991. All testimony and information reveals that the amount was 700 to 1,100 pounds." Leal maintained his innocence in the offense and objected to the use of 3,160 pounds as follows: "The defendant through his attorney maintains that he is innocent in this case and denies any guilt. . . . The attorney contends that the evidence at trial showed that the amount of marihuana involved in this case was 1,100 pounds."

a hearing for Becerra on April 6, 1994. At the sentencing hearings, the defendants again raised several different theories as to why they should not be sentenced based on the 3,160 pounds of marijuana discovered at the shed. At the March 28 hearing, Ramirez's attorney argued that he should not be sentenced based on the 3,160 pounds of marijuana because Ramirez did not have *knowledge* that 3,160 pounds was being transported. He explained that "if Jorge Ramirez contemplated that he was involved in an 1,100 pound count conspiracy that turned out to be a 3,000 pound conspiracy, I don't think he ought to be sentenced for 3,000 pounds." Significantly, Ramirez's counsel did not argue that only 1,100 pounds was transported and delivered to the shed by Becerra, or that 2,000 pounds was already in the shed. The district court rejected Ramirez's claim.

Counsel for Beco took a different approach at his March 28 sentencing hearing, arguing (for the first time) that 2,000 pounds of marijuana was already in the shed when Becerra began to unload the marijuana from the trailer. Beco's counsel explained that Becerra had now changed his mind about whether the shed was empty when he began unloading the trailer, and that Becerra was now willing to testify that the shed was full of marijuana when the trailer arrived. Judge Kazen rejected Beco's belated attempt to call Becerra to testify that the shed was full of 2,000 pounds of marijuana when he began unloading the trailer and that he had

-18-

inadvertently forgotten to tell the FBI agents and the probation officer of this fact during his many confessions.

Judge Kazen stipulated that Becerra was now willing to state that there was 2,000 pounds in the shed, but stated that he would not bring Becerra into court to backtrack again. Judge Kazen concluded that he would give no credibility to the self-serving, jail-house statement that 2,000 pounds of marijuana was already in the shed when the trailer arrived.[11] Judge Kazen decided instead

---

[11] Beco's counsel had the following exchange with Judge Kazen:

| Counsel: | The other point, Your Honor, just for clearing the record, because it would be a point on appeal for [Beco] Salinas; that I don't know whether the Government would stipulate or the Court acknowledges that Mr. Becerra is saying, presently, that there was some marijuana within, other than bringing him in to say it. |
| --- | --- |
| Court: | Well, if that's what you say is his latest theory -- |
| Counsel: | I spoke with [the probation officer] and he said that the last thing [Becerra] told him was that there was marijuana or some bundles there. Didn't you just tell me that? |
| Prosecutor: | The first time -- |
| Court: | I know -- I accept what my probation officer told -- and I'll say this for the record about Becerra, Becerra's a man who, when he was captured, gave a full and complete confession, then hired -- |

-19-

to rely on Becerra's uncoerced statements to the probation officer, Becerra's failure to object to the quantity of marijuana as set forth in his own PSR, and the unlikely scenario presented by the defendants' new theory (*i.e.*, that the elaborate conspiracy added only 1,100 pounds of marijuana to the stash of 2,000 pounds of marijuana already sitting in the shed when Becerra unloaded the trailer).[12]  Judge Kazen explained his reasons as follows:

|  | then got a lawyer, then fired that lawyer and got another lawyer, then all of a sudden was saying that all that confession was coerced.  Now, he's back here in front of me, the other day, firing that lawyer and saying that lawyer betrayed him in some way, and -- and I don't even know what he wants to do now. If he wants me to get him a new lawyer, and I haven't sentenced him yet, so I just don't think it's appropriate for me to bring him in here and have him start trying to backtrack again.  Because at this stage, I have -- you know, based on the record that I have with Mr. Becerra, I just -- you know, I give no credibility at this stage to what he's saying anyway. And so even aside from that, I -- |
|---|---|
| Counsel: | Even if he said that? |
| Court: | Right.  But I'll stipulate with you if that will help, if that's what he's telling you folks now. |

[12]    The district court also explained that it did not consider the confidential informant's testimony dispositive of the amount carried because the conspirators may have simply told the informant that he would be carrying 1,100 pounds in order to make him "feel less afraid to get involved," or perhaps because they wanted to pay him less for his role in the conspiracy.

Well, let me repeat the prior comments, but add one thing. Because, Mr. Perez [counsel for Beco], you've really raised two different theories, and so let me just comment. First of all, is the theory that maybe a good chunk of this marijuana, more than half of it, was already at the ranch.

I would say to you the following: As I understand this record, there is absolutely no dispute at all that -- when the agents went in to this ranch, shortly after the truck went in and when the bust was made, that they -- that there was 3,160 pounds there.

So theory number one is that two-thirds of that was already at this ranch, that all of this operation from the South, which involved these people here in Zapata coordinating with people from San Diego, meeting people in Mathis, arranging people to meet in San Antonio, following this whole convoy situation, all of which is in the record, was all done just to bring a little extra amount, or maybe 7 or 800 pounds, to a load that was already there over [2,000] pounds.

Number one, I don't think that makes any sense. Number two, the -- Becerra, although granted, he vacillates in and out of what his position is. But he has said to the probation office that it was a full truck loaded to the [g]ills, and that there was nothing else there when he off loaded it. Number three, the truck, as I said, was on constant surveillance.

For obvious reasons, Judge Kazen refused to give any credibility to the alleged change of heart by Becerra))made while Becerra and the other defendants were in custody awaiting sentencing, where the only remaining issue was the amount of marijuana for which the defendants would be sentenced. Particularly because Becerra was the only defendant who could testify to the offloading and he had already indicated in statements to the FBI and the probation officer that the load was over 3,000 pounds, Judge Kazen refused to indulge Beco's invitation to recall Becerra.

In Salinas, Jr.'s sentencing hearing on April 1, 1994, his

counsel conceded that the November 5th delivery involved the transportation of 3,000 pounds of marijuana. Again, he did not claim that there was already 2,000 pounds of marijuana in the shed; instead, he argued that the 3,000 pound load of marijuana was packaged in two distinct portions in the trailer and that Salinas, Jr. only *intended* to participate in a smaller conspiracy of 1,100 pounds of marijuana.[13] Judge Kazen questioned Salinas, Jr.'s counsel about his theory that Salinas, Jr. should not be sentenced on the entire amount of marijuana as follows:

> Court: Okay. And Becerra, however, so we can complete the story, also said that when he arrived at the Kirchner ranch to off-load the marijuana from this truck, he loaded it in a shed at the ranch, correct?
>
> Probation Officer: That's right.
>
> Court: Then there was nothing else in the shed. And when it was off-loaded, it's undisputed by everybody that there was 3,000 pounds in that trailer, correct?
>
> Counsel: I -- I understand.
>
> Court: What -- with that and I'm not -- I'm not criticizing you. I know there's different ones that raise this point, but they all have different theories about it. What's your theory?

---

[13] The probation officer had testified that Becerra told him that there were two distinct portions of marijuana in the trailer: "[O]ne of the portions was stacked very neatly and covered while the rest of the tanker trailer bundles were -- seemed to be disorganized and simply just thrown in there."

Counsel: My theory is, it is evident from the tapes that were -- in the Government's possession and introduced at trial, that my client was talking to -- between 700 to 1,100 pounds, period. In fact, as part of that same tape introduced at trial, after that had -- tape made after the bust itself, my client states -- or Aureliano, Jr. states that had he been involved in 3,000 pounds he would have done it this other way, you see, indicating a complete lack of knowledge, and I understand that a reasonable foreseeability on that is -- is a standard.

However, it was evident that he was still of the impression that you were dealing only in this lesser amount. And I know it's hard to get around that fact that there was 3,000 pounds, period, you know. There's -- but I think that perhaps a legal argument could be made that his intention was to get involved between 700 to 1,100. That he was involved I think that's a matter of -- of record, not involved in the loading itself; therefore, was unaware. Now, we have two separate packaging -- or not packaging, but loading structures. I don't know if it was -- the packaging was the same or not. There was no information with regards to that, but two separate, different loadings. And I think that weighs strongly on -- on Aureliano, Jr.'s involvement as to the amounts, Your Honor.

Once again, Salinas, Jr.'s counsel did not argue that there was any marijuana in the shed, and conceded that "it's hard to get around that fact that there was 3,000 pounds, period." Judge Kazen rejected Salinas, Jr.'s legal claim that he should not be held

legally responsible for the entire amount of marijuana that he assisted in transporting to the Kirchner Ranch. *See* U.S.S.G. § 1B1.3(a)(1)(A) (providing that defendant is accountable for "all acts and omissions committed, aided, abetted, counseled, [or] commanded" without respect to "reasonable foreseeability"); *see also United States v. Carreon*, 11 F.3d 1225, 1237 & n.60 (5th Cir. 1994) (noting that "reasonable foreseeability" limitation does not apply to conduct for which the defendant is an aider and abettor). Although Salinas, Jr. ordered a transcript of his sentencing hearing, the record indicates that it was never produced for the prior panel.

Judge Kazen's decision to rely on the conclusions in the PSR to sentence the defendants based on 3,160 pounds of marijuana was proven correct at Becerra's sentencing on April 6, 1994. At that hearing, Becerra admitted in open court that the shed was empty when he began to unload the marijuana from the trailer and that he told this to Officer Chavez during his PSR investigations. Becerra explained his recent vacillation to Judge Kazen by stating that while he was in jail, the other defendants told him to say that he unloaded only 1,000 pounds of marijuana and that there was already marijuana in the shed when he began to unload the trailer. Becerra also informed Judge Kazen that someone in the jail had threatened the safety of his family if he did not change his story about the amount of marijuana that he transported. The following exchange

-24-

occurred between Judge Kazen and Becerra:

Court:    -- there's no question that there
          was 3,000 pounds in that tanker.
          Mr. Chavez [the probation officer]
          says that you admitted that you
          unloaded --

Becerra:  Yeah.  I admitted I unload, but I --

Court:    And that that's -- that it was all
          there and that you're -- the
          codefendants are conjuring up this
          theory that it was -- half of it or
          more was already at the ranch, and
          you just added a little bit.

Becerra:  They -- they had -- they've been
          telling me that over there in jail,
          to say this, to say that.  I'm just
          going to say what I seen there.
          Like I told Mr. Chavez [the
          probation officer], there was
          nothing in the -- in the shed.  The
          only thing that was there was hay
          and some dog food or horses and --
          but I didn't know what was the
          amount on there or anything in the
          truck.

Court:    And -- and for that matter, I don't
          really have any reason to quarrel
          with that.  I mean -- you know, I
          don't know what you knew or didn't
          know, but it doesn't necessarily
          surprise me that they didn't spell
          out to you and say, "Mr. Becerra,
          now, we want you to help us and
          there's exactly 3,000 pounds in
          there."  The sense I get is that
          maybe nobody really knew.

The district court ultimately sentenced all of the defendants

based on 3,160 pounds of marijuana.[14]  All of the defendants

_____

[14]    Based on the quantity of marijuana, the district court
imposed the following sentences:

-25-

appealed their convictions to our court, and all but Leal challenged the district court's use of 3,160 pounds of marijuana for sentencing.  Significantly, neither the transcript of Becerra's sentencing hearing nor the content of his FBI statements was put before our prior panel.

II

A

In our prior opinion, although we affirmed the convictions of all the defendants, we reversed and vacated the sentences because we found that "[t]he district court's findings as to the amount of marijuana to attribute [were] not supported by a preponderance of the evidence."  The panel rested its conclusion on the defendants'

---

1. Salinas, Sr. - 240 months in the custody of the Bureau of Prisons, a fine of $3,000 and a supervised release term of ten years.

2. Leal - 240 months in the custody of the Bureau of Prisons, a $2,000 fine and a supervised release term of ten years.

3. Salinas, Jr. - 168 months in the custody of the Bureau of Prisons, a fine of $2,500 and a supervised release term of five years.

4. Becerra - 135 months in the custody of the Bureau of Prisons, a fine of $1,000 and a supervised release term of five years.

5. Ramirez - 125 months in the custody of the Bureau of Prisons, a fine of $2,500 and a supervised release term of five years.

6. Beco - 125 months in the custody of the Bureau of Prisons, a fine of $2,500 and a supervised release term of five years.

assertions (in their briefs on appeal) that there was no evidence that the trailer contained all 3,160 pounds discovered at the shed. As demonstrated above, however, there was substantial evidence that the trailer contained all 3,160 pounds discovered at the shed; the problem for the prior panel was that little of it was in the appellate record. Although Becerra appealed his sentence and conviction, he failed to order a transcript of his sentencing hearing. In doing so, he violated our well established rule that a defendant's failure to order those parts of the record containing errors prevents the court from reviewing the error. *See* FED. R. APP. P. 10(b)(2) ("If the appellant intends to urge on appeal that a finding or conclusion is unsupported by the evidence or is contrary to the evidence, the appellant shall include in the record a transcript of all evidence relevant to such finding or conclusion."); *see also United States v. Narvaez*, 38 F.3d 162, 167 (5th Cir. 1994) ("As the district court relied upon such evidence and as Narvaez failed to order that portion of the record, this court is precluded from reviewing his allegation."). The panel, however, did not enforce the rule and proceeded to review Becerra's claim of error. In addition to Becerra's failure to order the sentencing hearing transcript, neither the government nor any of the defendants told the prior panel about the events that took place at Becerra's sentencing hearing (*i.e.*, that Becerra told Judge Kazen that the shed was empty when he began unloading the

trailer and that the other defendants were telling him to lie about it). Furthermore, the government failed to inform the panel that in his confessions to the FBI, Becerra admitted that he was told that the delivery would be 3,000 pounds.

Consequently, because the parties failed to provide the panel with critical information, the panel opinion focused on the testimony at trial (rather than all of the events relevant to the district court's sentencing decision): "The testimony at trial as to the amount of marijuana to be transported differed from the amount actually seized. None of the testimony indicated over 3,000 pounds of the substance." *Leal*, 74 F.3d at 607. These conclusions were correct to the extent that they were based on the portion of the record which the panel had the opportunity to review: the government did not put forward any testimony at trial regarding the 3,160 pounds (which, as we noted above, it did not have to do because the weight is not an element of the offense, *see supra* at 9 n.6). The panel opinion continued, however, explaining what it believed to be the district court's reasons for sentencing the defendants on the entire amount found in the shed:

> The [district] court found it incredulous that the defendants would engage in such a complicated scheme to contribute only a third of the amount to an existing stash. Furthermore, the court surmised that the defendants may have understated the actual amount to the CI for fear he would demand greater compensation given the true value of his services to the operation.

*Id.* at 607-08.

-28-

Because of the inadequate record before it, the prior panel concluded that the district court's "suppositions" were based on "intuition alone." *Id.* at 608 n.1. The prior panel found that "[t]he disparity in the evidence between the defendants activities and the amount of drugs seized [was] not adequately explained. The reasons the court gave [were] mere rationalizations, not specific enough to assure us sufficiently that the defendants are reasonably responsible for all the marijuana found at the ranch." *Id.* at 608. Thus, the opinion "vacate[d] the sentence and remand[ed] to the district court for resentencing, attributing to the defendants the amount of marijuana related in the testimony at trial." Significantly, the opinion also specified that the testimony at trial "ranged from 500 pounds to a little over 1,000 pounds. In particular, the CI said that he was told the defendants agreed to deliver 1,100 pounds of the substance by tanker/trailer." *Id.* at 607.

B

The government filed a petition for panel rehearing in *Leal*, arguing that the district court did not commit clear error when it attributed 3,160 pounds to the defendants. Instead of setting forth the significant facts that had been omitted from both its brief on appeal and the appellate record (as it has done in this appeal), the government again failed to bring any of the critical facts to the attention of the panel. In contrast to its position

-29-

here (*i.e.*, that the evidence clearly demonstrates that the defendants transported 3,160 pounds), the government argued in its petition for rehearing simply that "there were two permissible constructions of the evidence":

> There are two plausible views of the evidence as it relates to the amount of marijuana actually transported by the conspirators in the truck. First, the shed at the ranch contained no more than 1,500 pounds of marijuana when the truck entered the ranch on November 5. . . .
> While this scenario is plausible, it is most unlikely. There is no evidence in the record that marijuana was in the shed when the truck arrived, and Becerra did not tell the agents this when he confessed. . . .
> Second, the shed was empty when the truck arrived, and the amount of marijuana unloaded by Becerra and Leal was in excess of 3,100 pounds. . . . It is also possible that the conspirators did not know exactly how much marijuana they were going to transport until the last minute.
> In any event, either scenario is possible. The district court chose the second possibility, and cannot have been clearly erroneous in doing so.

The government's argument demonstrates that it wholly failed to bring the relevant facts to the attention of the panel. Indeed, judging from the contents of its petition for panel rehearing, it appears that the government was completely unaware of them. Not surprisingly, the prior panel rejected the government's petition for panel rehearing. Thereafter, the court issued six separate (but identical) mandates))a separate mandate for each defendant, including Leal))stating that "the judgment of the District Court in this cause is affirmed, and the cause is remanded to the District Court for further proceedings in accordance with the opinion of this Court." The government did not seek a stay of the mandate

with respect to the remand of Leal's or any defendant's sentence.

III

Because this case reaches us on appeal for the second time, we must consider the implications of our prior opinion in *Leal* and the well-settled "law of the case" doctrine. "Under the 'law of the case' doctrine, an issue of law or fact decided on appeal may not be reexamined either by the district court on remand or by the appellate court on a subsequent appeal." *Illinois Cent. Gulf R.R. v. International Paper Co.*, 889 F.2d 536, 539 (5th Cir. 1989). This self-imposed doctrine "serves the practical goals of encouraging finality of litigation and discouraging 'panel shopping.'" *Id.* at 539; *see also Lehrman v. Gulf Oil Corp.*, 500 F.2d 659, 662 (5th Cir. 1974). "It is predicated on the premise that 'there would be no end to a suit if every obstinate litigant could, by repeated appeals, compel a court to listen to criticisms on their opinions or speculate of chances from changes in its members.'" *White v. Murtha*, 377 F.2d 428, 431 (5th Cir. 1967) (quoting *Roberts v. Cooper*, 61 U.S. (20 How.) 467, 481, 15 L. Ed. 969 (1857)). The law of the case doctrine, however, is not inviolate. We have explained that "a prior decision of this court will be followed without re-examination . . . unless (i) the evidence on a subsequent trial was substantially different, (ii) controlling authority has since made a contrary decision of the law applicable to such issues, or (iii) the decision was clearly

erroneous and would work a manifest injustice." *North Mississippi Communications, Inc. v. Jones*, 951 F.2d 652, 656 (5th Cir. 1992); *see also City Pub. Serv. Bd. v. General Elec. Co.*, 935 F.2d 78, 82 (5th Cir. 1991); *Lyons v. Fisher*, 888 F.2d 1071, 1074 (5th Cir. 1989); *Daly v. Sprague*, 742 F.2d 896, 901 (5th Cir. 1984).

A corollary of the law of case doctrine, known as the mandate rule, provides that a lower court on remand must "implement both the letter and the spirit of the [appellate court's] mandate," and may not disregard the "explicit directives" of that court. *See Johnson v. Uncle Ben's, Inc.*, 965 F.2d 1363, 1370 (5th Cir. 1992). "The mandate rule simply embodies the proposition that 'a district court is not free to deviate from the appellate court's mandate.'" *Barber v. International Bhd. of Boilermakers*, 841 F.2d 1067, 1070 (11th Cir. 1988) (quoting *Wheeler v. City of Pleasant Grove*, 746 F.2d 1437, 1440 n.2 (11th Cir. 1984)); *see also Harris v. Sentry Title Co.*, 806 F.2d 1278, 1279 (5th Cir. 1987) ("It cannot be disputed that 'when the further proceedings [in the trial court] are specified in the mandate [of the Court of Appeals], the district court is limited to holding such as are directed.'") (alterations in original) (quoting 1B MOORE'S FEDERAL PRACTICE ¶ 0.404(10), at 172 (1984)); *Newball v. Offshore Logistics Int'l*, 803 F.2d 821, 826 (5th Cir. 1986) (holding that "a mandate controls on all matters within its scope").

Consequently, unless one of the exceptions to the law of the

case doctrine applies, the district court was bound to follow our mandate and to resentence the defendants based on the testimony at trial. *See, e.g., Johnson*, 965 F.2d at 1370 ("The 'mandate rule' is a specific application of the 'law of the case' doctrine.") (internal quotation marks omitted); *see also Litman v. Massachusetts Mut. Life Ins. Co.*, 825 F.2d 1506, 1516 (11th Cir. 1987) (en banc) ("If circumstances after remand fall into one of the three exceptions to the mandate rule, the district court has greater discretion to act. If the circumstances after remand do not fall into one of the exceptions . . . then the district court is constrained to follow the mandate issued by the appellate court."). The government urges that both the first and third exceptions to the law of the case doctrine apply to the case at hand.[15] We address each argument in turn.

_____

[15] The government also argues that the district court was not bound by our mandate to resentence the defendants based on "the testimony at trial" (and that it could, instead, consider additional evidence which the government incidentally failed to put before the prior panel). We reject the government's attempt to circumvent the narrow exceptions to the mandate rule and the explicit language of our mandate. *See Cole Energy Dev. Co. v. Ingersoll-Rand Co.*, 8 F.3d 607, 609 (7th Cir. 1993) ("[E]xplicit directives by [an appellate] court to [a] lower court concerning proceedings on remand are not dicta."); *Litman v. Massachusetts Mut. Life Ins. Co.*, 825 F.2d 1506, 1511 (11th Cir. 1987) (en banc) ("When an appellate court issues a specific mandate it is not subject to interpretation; the district court has an obligation to carry out the order. A different result would encourage and invite district courts to engage in *ad hoc* analysis of the propriety of appellate court rulings.").

The government does not argue that the terms of our mandate were vague or unclear. The argument that the prior panel should have allowed the district court to resentence the defendants based

At the 1996 resentencing, the district court rejected the government's belated attempt to introduce Becerra's January 18th statement because our mandate ordered the district court to resentence the defendants based on "the testimony at trial." The government argues that the district court erred in rejecting the introduction of additional evidence because the evidence on remand was substantially different. We reject the government's attempt to expand this law of the case exception to correct its own oversight in failing to present the critical evidence to the prior panel.[16]

_____

on any evidence that it found relevant))whatever strength it may have, *cf. United States v. Kinder*, 980 F.2d 961, 963 (5th Cir. 1992) ("'[I]n the interest of truth and fair sentencing a court should be able on a sentence remand to take new matter into account on behalf of either the government or the defendant.'")))should have been presented to the prior panel in the government's petition for panel rehearing or a motion to stay the mandate. Thus, unless an exception to the law of the case doctrine applies, the district court was bound to resentence the defendants based on "the testimony at trial."

[16] In an attempt to characterize Becerra's FBI confessions as "new" evidence, the government asserts in its brief that "[t]he district court did not learn of the statements Becerra made to the FBI until resentencing in 1996." This assertion is both wrong and irrelevant. First, before trial, Judge Kazen held an extensive hearing on Becerra's motion to suppress the very statements that the government argues he did not learn about until resentencing. *See supra* at 7-8. Furthermore, at trial, defense counsel explicitly requested that Judge Kazen read Becerra's FBI statements for himself. *See supra* at 12 n.7. Second, even assuming that Judge Kazen did not know about the contents of the FBI statements, the government's failure to present this evidence to the district court does not justify or explain its similar failure to put this evidence before the prior panel))particularly in light of the fact that Becerra's motion to suppress his FBI statements was one of the primary issues in the first appeal. *See Lyons*, 888 F.2d at 1075;

The government fails to provide any reason why it did not, or could not, present Becerra's FBI statements to the prior panel in either the first appeal or the motion for reconsideration. *See Lyons*, 888 F.2d at 1075 ("The truth is [] that Fisher flatly failed in the prior proceeding, for reasons best known to him, to adduce evidence of any consideration, despite his having both the reason and opportunity to do so."); *Litman*, 825 F.2d at 1516 ("Mass Mutual's failure to seek modification of our decision had the effect of binding the district court to our instructions as set forth in the clear mandate."). Moreover, our prior opinion did not leave the issue open for decision nor authorize the district court to consider additional evidence. "We have held that the 'substantially different' evidence exception to the law-of-the-case doctrine does not apply where a prior appeal has not left the issue open for decision." *Lyons*, 888 F.2d at 1075; *see also Barber*, 841 F.2d at 1072 n.5 ("The law of the case exceptions apply only when substantially different evidence comes out in the course of a subsequent trial authorized by the mandate."); *Goodpasture, Inc. v. M/V Pollux*, 688 F.2d 1003, 1006 n.5 (5th Cir. 1982) ("[T]he exception to law of the case where 'evidence on a subsequent trial [is] substantially different' is inapplicable where by the prior appeal the issue is not left open for decision.'") (quoting *National Airlines, Inc. v. International Ass'n of Machinists*, 430

_____

*Barber*, 841 F.2d at 1072-73.

-35-

F.2d 957, 960 (5th Cir. 1970)).

The prior panel specifically instructed the district court to resentence the defendants based on "the testimony at trial." *Cf. Barber*, 841 F.2d at 1072 n.5 (rejecting application of the "substantially different evidence" exception because "[t]he fact remains [] that there should have been no opportunity for substantially different evidence to appear, as Sharit's referrals were not to be considered on remand"). Thus, similar to our conclusion in *Lyons*, "the district court properly denied [the government] the right on remand to offer evidence that [it] had had every opportunity and incentive to produce at the earlier proceeding." *Lyons*, 888 F.2d at 1075; *see also Baumer v. United States*, 685 F.2d 1318, 1321 (11th Cir. 1982) (refusing to apply "substantially different evidence" exception because "[t]here is nothing in the record to indicate that the evidence produced at the hearing after remand was unavailable to the taxpayers during the first trial").

B

The government also argues that the district court was not bound by the law of the case because our prior decision is "clearly erroneous" and the error works a "manifest injustice." Whether this exception applies is a close question. As demonstrated, the prior opinion is the result of critical facts being omitted from the appellate record by both the government and the defendants,

and, to a lesser extent, the panel's decision to proceed without the transcripts of Becerra's and Salinas, Jr.'s sentencing hearings.[17]

Our decision in *Lyons v. Fisher* presents a relatively analogous situation and a useful guide to the case at hand. *See Lyons*, 888 F.2d at 1073. In *Lyons*, our first opinion had reversed the district court's order granting summary judgment in favor of the defendant on an alleged land transaction. We concluded (on the first appeal) that the particular land transfer in question was an "absolute nullity" because there was a lack of consideration for the transfer and remanded for "further proceedings consistent with this opinion." *Id.* On remand, the defendant filed an affidavit with the district court asserting that he had been paid $450 as

---

[17] Indeed, the government argued in the first appeal that the panel should not consider Becerra's and Salinas Jr.'s claims of sentencing error because they failed to provide the relevant portions of the record. *See Leal*, 74 F.3d at 607. The government's argument is backed by a forceful array of precedent. *See, e.g.*, *United States v. Narvaez*, 38 F.3d 162, 167 (5th Cir. 1994) (holding that a defendant's failure to order those parts of the record that he contends contain error will prevent us from reviewing that assignment of error); *United States v. Hinojosa*, 958 F.2d 624, 632 (5th Cir. 1992) (same); *United States v. Juarez-Fierro*, 935 F.2d 672, 675 n.1 (5th Cir. 1991) (same); *United States v. O'Brien*, 898 F.2d 983, 985 (5th Cir. 1990) (same); *see also* FED. R. APP. P. 10(b)(2) (requiring that appellant provides transcript "of all evidence relevant to [the district court's] finding or conclusion"). Once again, the government failed to raise this issue in its petition for panel rehearing, and more importantly, could have solved the problem itself by simply informing the prior panel of the substance of Becerra's sentencing hearing (*i.e.*, that he confessed to Judge Kazen that the shed was empty).

consideration for the land transfer, and thus, he argued, our panel erred in concluding that the transfer was void for lack of consideration. The district court, however (similar to the district court here), refused to consider this "new" evidence, holding that the law of the case doctrine precluded it from further considering the question of the validity of the consideration. On the second appeal, the defendant argued that the clearly erroneous and manifest injustice exception applied. We disagreed and concluded that the defendant could not demonstrate "manifest injustice" because he was the one at fault for failing to put forth the relevant evidence in the first appeal. We explained that

> We might be persuaded that manifest injustice had occurred as a result of the alleged error if Fisher had presented such evidence in the prior proceeding and the previous panel had disregarded the evidence because of a misunderstanding of the law, or if consideration had become an issue only after it reached the appellate level and Fisher had had no opportunity in the prior proceeding to adduce such evidence.

*Id.* at 1075. However, because "Fisher flatly failed in the prior proceeding, for reasons best known to him" to adduce the purported new evidence, "despite his having both the reason and the opportunity to do so," we rejected his claim of manifest injustice. *See id.*

Similarly, in the case at hand, the government now presents to this court))for the first time))Becerra's confession to the FBI and the substance of his sentencing hearing before Judge Kazen. While both indeed support the district court's first sentencing decision,

-38-

the government "flatly failed" to adduce this evidence in the first appeal.  *See id.; see* also *Barber*, 841 F.2d at 1072 n.5 (refusing to allow plaintiffs to put forth "new" evidence that had not been offered at the first trial because "it is well settled that plaintiffs in all cases are to be given their day in court, nothing less but nothing more.  Barber was given such an opportunity, as the case was fully tried the first time, and the 'new' records . . . were available then.").  We recognize that Becerra shoulders considerable blame for failing to order the transcript of his sentencing hearing and that our prior decision grants the defendants a reprieve from their original sentence.  We wish to emphasize that this Court does not countenance Becerra's failure to provide the relevant transcripts of his sentencing hearing and that this case should serve as a significant reminder of the rationale for the waiver rule.  *See* FED. R. APP. P. 10(b)(2); *see also supra* at 32 n.17.

Nonetheless, the government cites no case where our court (or any court, for that matter) has found that a prior opinion works a manifest injustice where the party claiming injustice had all the means and incentive to provide the relevant information in the first appeal.  *Cf. Lyons*, 888 F.2d at 1075 (refusing to find exception to law of the case doctrine because appellant had "every opportunity and incentive to produce [the relevant evidence] at the earlier proceeding").  Furthermore, the government makes no

argument why this "extraordinary" exception to the law of the case doctrine should apply to the government's failure to provide relevant evidence in a criminal case. "As this Court has noted in previous cases, 'In this circuit, . . . the law-of-the-case doctrine is supplanted by our firm rule that one panel cannot disregard the precedent set by a prior panel even though it perceives error in the precedent." *Harris*, 806 F.2d at 1282 (alterations in original) (quoting *United States v. 162.20 Acres of Land*, 733 F.2d 377, 379 (5th Cir. 1984)). Even if we may have reached a different result than our prior panel on the incomplete record that was before them, our conclusion does not rise to the extraordinary level required to find a manifest injustice. *See City Public Serv. Bd.*, 935 F.2d at 82 ("Only in extraordinary circumstances may this court sustain a departure from the 'law of the case' doctrine on the ground that a prior decision was clearly erroneous. Mere doubts or disagreement about the wisdom of a prior decision of this or a lower court will not suffice for this exception."); *Parts & Elec. Motors, Inc. v. Sterling Elec., Inc.*, 866 F.2d 228, 233 (7th Cir. 1988) ("To be clearly erroneous, a decision must strike us as more than just maybe or probably wrong; it must, as one member of this court recently stated . . . strike us as wrong with the force of a five-week-old, unrefrigerated dead fish.").

Ultimately, therefore, because blame also falls largely at the

feet of the government for failing to point out to the prior panel Becerra's confessions to the FBI and the probation officer, or his statements to Judge Kazen at the April 6th sentencing hearing, we decline to find that our prior opinion results in a manifest injustice. *See Lyons*, 888 F.2d at 1075-76 (rejecting application of manifest injustice exception because "[i]t was only after this court rendered its decision, and it became apparent that consideration was indeed the win-lose issue of this case" did the appellant attempt to introduce the relevant evidence); *Barber*, 841 F.2d at 1072 n.5 (refusing to find exception to the law of the case doctrine when failure to bring relevant evidence was the appellant's own fault). Our conclusion in *Lyons* is particularly apt here: "[G]iven [the appellant's] opportunity and his puzzling failure to adduce such evidence earlier, we hold that [the appellant] has not suffered 'manifest injustice' simply because the law-of-the-case doctrine may now preclude his tardy introduction of that evidence." *Lyons*, 888 F.2d at 1075.

Consequently, because none of the exceptions to the law of the case doctrine apply, the district court properly followed our prior opinion in resentencing the defendants.

IV

The government also contends that the district court lacked jurisdiction to resentence Leal, claiming that "Leal's sentence was not vacated by this court." We disagree, and note that the

government itself concedes the very point in its brief.[18]

The existence of jurisdiction is a question of law that we review *de novo*. *See United States v. Teran*, 98 F.3d 831, 833-34 (5th Cir. 1996). As a general matter, a "district court regain[s] jurisdiction over [a] case upon our issuance of the mandate." *Arenson v. Southern Univ. Law Ctr.*, 963 F.2d 88, 90 (5th Cir. 1992); *see also United States v. Dozier*, 707 F.2d 862, 864 n.2 (5th Cir. 1983). Unless recalled, that mandate "controls on all matters within its scope." *Newball*, 803 F.2d at 826. No party having moved to stay or recall this mandate, our inquiry into the basis for the district court's jurisdiction to resentence Leal is at an end. *See Leroy v. City of Houston*, 906 F.2d 1068, 1074 (5th Cir. 1990) (holding that an appellate mandate retains its force unless recalled, because even if some portions of the mandate appear to be "the result of inadvertence on the part of the appellate court," the "appropriate procedure" in that situation is to "move this Court to recall its mandate"). In the face of the government's explicit concession, *see supra* at 36 n.18, as well as the fact that a specific mandate issued for Leal,[19] we reject the government's

[18] In its brief, the government states that this court "vacated the sentences of all defendants, *including Leal*, and remanded for resentencing." (emphasis added). The government does not attempt to explain its later contrary assertion.

[19] As noted above, *see supra* at 26, separate judgments issued as to each defendant, and the particular judgment captioned "United States versus Victor Leal," states that "the cause is remanded to the district court for further proceedings in

-42-

claim that the district court lacked jurisdiction to resentence Leal following the issuance of our mandate in his case. *See Newball*, 803 F.2d at 826 ("When an appellate mandate is issued, a district court reacquires jurisdiction.").

V

We turn now to Becerra's contentions on appeal, specifically his assertion that the district court erred in denying him a four-level reduction for minimal participation and a three-level reduction for acceptance of responsibility. The government asserts that Becerra failed to raise these sentencing issues on the first appeal, and that the law of the case therefore bars our consideration of these abandoned claims. We agree. "[A] legal decision made at one stage of a civil or criminal case, unchallenged in a subsequent appeal despite the existence of ample

---

accordance with the opinion of this Court." The opinion, in turn, states that "[w]e vacate the sentence and remand to the district court for resentencing, attributing *to the defendants* the amount of marijuana related in the testimony at trial." *Leal*, 74 F.3d at 608 (emphasis added). Even if our prior opinion should not have given Leal the benefit of an argument he did not raise, *but cf.* FED. R. CRIM. P. 52(b) ("Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court."), the government should have raised this argument with a motion to stay the mandate. *See* 5TH CIR. R. 41.2 (providing that a mandate may be recalled to "prevent injustice"); *see also Leroy v. City of Houston*, 906 F.2d 1068, 1075 (5th Cir. 1990) (refusing to treat an appeal following remand as a motion to recall the prior mandate); *Barber*, 841 F.2d at 1071 n.2 (refusing to consider additional argument on second appeal when "counsel requested neither rehearing by the panel nor rehearing by the court en banc"); *Litman*, 825 F.2d at 1513 (explaining that appellee's failure to seek any modification of appellate court's prior decision limited the issues to those specified on remand).

opportunity to do so, becomes the law of the case for future stages of the same litigation, and the aggrieved party is deemed to have forfeited any right to challenge that particular decision at a subsequent date."  *United States v. Bell*, 988 F.2d 247, 250 (1st Cir. 1993).  Because Becerra did not challenge the district court's minimal participant and acceptance of responsibility decisions in his first appeal, we need not consider those belated challenges here.    Even  if  we  were  to  reach  the  merits  of  Becerra's contentions, they are without merit.

A

Whether Becerra was a "minimal participant," entitled to a four-level reduction pursuant to U.S.S.G. § 3B1.2(a), or a "minor participant,"  entitled  to  a  two-level  reduction  pursuant  to U.S.S.G. § 3B1.2(b), is a factual determination that we review only for clear error.  *See United States v. Pofahl*, 990 F.2d 1456, 1485 (5th Cir. 1993).  Minimal participants are those who demonstrate a "lack of knowledge or understanding of the scope and structure of the enterprise."  *See United States v. Mitchell*, 31 F.3d 271, 278 (5th Cir. 1994) (citing U.S.S.G. § 3B1.2, cmt. (n.1)).  Minor participants are those "less culpable than most other participants, but whose role could not be described as minimal."  *Id.* (citing U.S.S.G. § 3B1.2, cmt. (n.3)).

The testimony at trial established that Becerra knew that he was involved with several other people in an attempt to transport

a load of marijuana from Laredo, Texas to Bulverde, Texas, and that his role in the operation was to assist in the unloading of the marijuana once it reached its final destination. Such knowledge belies any claim to minimal-participant status. *See Rosier v. United States Parole Comm'n*, 109 F.3d 212, 214 (5th Cir. 1997) (holding that the defendant could not "reasonably assert that he lacked knowledge or understanding of the enterprise to the degree necessary to support a reduction as a minimal participant," when he admitted to driving the vehicle on other occasions in exchange for "large sums of money," and also admitted that he "suspected that drugs were in the van"). Accordingly, we hold that the district court did not err in determining that Becerra qualifies as a minor rather than a minimal participant.

B

Whether Becerra "accepted responsibility" in a manner sufficient to entitle him to a three-level reduction under U.S.S.G. § 3E1.1, is a determination requiring some judgment as to credibility, and therefore will "not be disturbed unless it is without foundation." *United States v. Maldonado*, 42 F.3d 906, 913 (5th Cir. 1995). The guidelines indicate that an acceptance-of-responsibility reduction is generally not appropriate when a defendant "puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilt and expresses remorse." U.S.S.G. § 3E1.1,

cmt. (n. 2); *see also United States v. Branch*, 91 F.3d 699, 742 (5th Cir. 1996) (noting that "[w]hile conviction by trial does not 'automatically preclude' the availability of this [reduction], the Guidelines contemplate that those cases in which the defendant both accepts responsibility within the meaning of this section and goes to trial will be 'rare'") (citations omitted).

The district court did not find Becerra to be one of those "rare" defendants who goes to trial and yet may fairly be said to have accepted responsibility.  This determination, far from being "without foundation," appears well supported by the record.  As Becerra's counsel noted in his closing statement to the jury: "Ruben Gil Becerra is here before you and he's maintaining his innocence . . . [t]here's no evidence to show that he possessed marijuana, no evidence whatsoever."  On direct appeal, Becerra continued to challenge the sufficiency of the evidence presented by the government.  Whatever assistance Becerra may have provided to the FBI post-arrest and pre-trial, Becerra's overall approach to the charges against him does not demonstrate an acceptance of responsibility.  *See id.* (rejecting as "ludicrous" a defendant's suggestion that he was entitled to a three-level reduction for acceptance of responsibility when he provided a post-arrest statement, but contested his factual guilt at trial, and even proclaimed at sentencing that "we still stand on our innocence").  We therefore find no error in the district court's denial of a

three-level, acceptance-of-responsibility reduction.

                                    VI

    For the foregoing reasons, the judgment of the district court
is, in all respects, AFFIRMED.